**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| LARRY DIXON, LARRY DIXON RACING, LLC, and CHAMPIONSHIP ADVENTURES, LLC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>NATIONAL HOT ROD ASSOCIATION, )<br><br>Defendant. ) | Case No.:  1:19-CV-1470<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiffs Larry Dixon ("Mr. Dixon"), Larry Dixon Racing, LLC, and Championship Adventures, LLC (collectively, "Plaintiffs"), by counsel, and file their Complaint against Defendant National Hot Rod Association ("NHRA" or "Defendant") and for cause of action respectfully show this Honorable Court the following:

1.      This case initially arose from NHRA's wrongful suspension and monopolistic blacklisting of Mr. Dixon, a three-time NHRA national champion who has devoted his entire career to NHRA racing—a career spanning nearly 25 years, free of any disciplinary action until the unlawful, capricious actions by Defendant that spawned this case.  Mr. Dixon competed at the highest levels of NHRA, and has achieved widespread recognition for his skill, sportsmanship, focus on safety, and success as an NHRA competitor.

2.      In or around 2015, Mr. Dixon developed the idea of a two-seater top fuel dragster (the "Two-Seater Dragster"), based on both his experiences over more than two decades as a top-fuel dragster race-car driver and also by observing the success of similar business ventures in

other forms of motorsports.  Even though he was not required to do so, Mr. Dixon initiated discussions of his idea in 2016 and continued discussions into 2017 with top NHRA executives, who expressed enthusiasm and interest in his initiative.  While NHRA representatives asked questions, *at no time* did they ever state or imply that Mr. Dixon was prohibited from pursuing this business venture, that he would be banned from NHRA if he pursued it, or that NHRA has not approved and would not approve the car.  Relying on NHRA's response, Mr. Dixon then proceeded to invest in building a prototype Two-Seater Dragster—"at or above" the safety specifications for a top-fuel dragster used in competition. In fact, the prototype Two-Seater Dragster was designed by an experienced and well-qualified representative of the very organization, the SFI Foundation, that sets safety specifications for top-fuel dragsters used in competition.

3.     The Two-Seater Dragster is not designed for competition.  It is not designed to race and therefore is not governed by NHRA "rules."  Rather, it is what is commonly referred to as an "exhibition" vehicle.  Because it is not designed to race, like other exhibition cars—such as two-seater cars in other forms of motorsports as well as in NHRA itself—the Two-Seater Dragster does not have SFI specifications.

4.     During the time the Two-Seater Dragster was being built, Mr. Dixon engaged in discussions with various race tracks to run the car, and with various potential sponsors for the car.  The race track promoters and potential sponsors expressed great interest in participating in this business venture. And until NHRA's misconduct giving rise to this action, agreements between Plaintiffs and those promoters and sponsors were imminent.

5.     In November 2017, after more than two years of development efforts and the investment of hundreds of thousands of dollars, Championship Adventures, LLC

("Championship Adventures"), a company formed and funded to develop Mr. Dixon's prototype Two-Seater Dragster, proudly displayed its prototype at SEMA, an independent, third-party trade show held in Las Vegas, Nevada. Plaintiffs' decision to display the Two-Seater Dragster at SEMA was based in part on NHRA representatives' previously-expressed enthusiasm regarding the exhibition car. NHRA was merely a vendor at the SEMA Show and nothing more, and the SEMA Show was not a sanctioned "NHRA Event" as that term is defined in the NHRA Rulebook. The promoter of the SEMA Show was very excited about the Two-Seater Dragster, and Mr. Dixon received many compliments at the show on the prototype car.

6.      During SEMA, while Mr. Dixon was away from the display of the Two-Seater Dragster, a representative of NHRA engaged in an unauthorized inspection of the Two-Seater Dragster. In so doing, the NHRA representative found an expired NHRA sticker down inside the cockpit of the car, out of the sight of anyone. Indeed, to see this sticker, one would have to extend his head down inside the cockpit, which no one except Plaintiffs were permitted to do. The sticker displayed an expired date. Even though the Two-Seater Dragster prototype was owned by Championship Adventures and the sticker was owned by Mr. Dixon, and even though the SEMA Show was not an NHRA event, the NHRA representative nonetheless demanded that the sticker be covered up. He would later return and confiscate the sticker, all while Mr. Dixon was away.

7.      To Mr. Dixon's total shock and dismay, at the conclusion of SEMA, NHRA sent written notification to Mr. Dixon that, effectively immediately, he was *indefinitely suspended* from participating *in any NHRA event in any capacity*. The purported bases for Mr. Dixon's indefinite suspension were two alleged violations of the NHRA Rulebook arising from the display of the Two-Seater Dragster prototype, even though the NHRA Rulebook and the

specified rules did not apply to the SEMA Show by their own terms, and even if they had applied, Mr. Dixon clearly and unambiguously had committed no violations of those rules.

8.      NHRA then instructed their "NHRA Member Tracks"—believed to be in excess of 140 race tracks—that they could not allow Championship Adventures' Two-Seater Dragster on their tracks *at any time*, even during those time periods when NHRA is not using the tracks. Importantly, NHRA does not own these "member tracks" but possesses significant control over those track owners by virtue of NHRA's monopoly over professional drag racing.  One of the NHRA representatives delivering these instructions was on the very three-person panel appointed to decide Mr. Dixon's appeal of the penalty.  Because of NHRA's actions, the race track promoters and potential sponsors with whom Mr. Dixon had been negotiating, and others that had previously expressed interest, told Mr. Dixon that they could not do business with him or Championship Adventures.

9.      NHRA has refused to correct either its unjustified and draconian punishment of Mr. Dixon or its orchestration of an unlawful boycott of Mr. Dixon's business venture.  Instead, NHRA doubled down, denying Mr. Dixon the opportunity to attend his own appeal hearing and misrepresenting to him that it was unnecessary for him to retain legal representation.  After Mr. Dixon later engaged legal counsel, NHRA violated its own Rulebook by declaring Mr. Dixon "guilty" and cutting off further appeal proceedings by purportedly lifting his suspension for "time served."  And in order to gain or strengthen its control over the antitrust markets defined below, NHRA unlawfully conditioned Mr. Dixon's purported reinstatement on his acceptance of NHRA's continuing illegal boycott and tortious interference with Championship Adventures. Accordingly, Mr. Dixon has been deprived of his livelihood and sole source of income for more

than *a year*, and that deprivation continues today due to NHRA's refusal to clear Mr. Dixon's name and cease its unlawful interference.

10.    NHRA's actions against Mr. Dixon are arbitrary and capricious, contrary to its own rules, contrary to law, and have been conducted in bad faith.  In taking these actions, NHRA has defamed Mr. Dixon and ruined his reputation so that no one will hire him.  NHRA's proffered justifications for Mr. Dixon's suspension were mere pretexts.  NHRA's real, unlawful motivation for suspending Mr. Dixon was to exercise its monopolistic powers for its own economic gain.  In so doing, NHRA is acting contrary to its stated non-profit and tax exempt purposes.

11.    Plaintiffs in this action seek injunctive relief requiring NHRA to discontinue its direction of a boycott and tortious interference with Plaintiffs' business venture and its unlawful conditioning of Mr. Dixon's reinstatement on his acceptance of those actions, damages for his lost income and profits, damages for defamation, treble and/or punitive damages, attorneys' fees, and all other just and appropriate relief, as further set forth herein.

## **PARTIES**

12.    Mr. Dixon is a citizen of Indiana who resides within this judicial district and division.

13.    Larry Dixon Racing LLC is a single member Indiana LLC with its principal place of business in Indiana. Mr. Dixon is the sole member and managing member.

14.    Championship Adventures, LLC is an Indiana LLC with its principal place of business in Indiana. Championship Adventures, LLC was formed by Mr. Dixon and owns Mr. Dixon's prototype Two-Seater Dragster.

15.    NHRA is a California non-profit corporation with its principal place of business in California.

16.     NHRA is a drag-racing governing body and is the largest auto-racing organization in the world. NHRA provides the only avenue for drag racers to actually earn a living by drag racing.  While the extent of its authority to do so is challenged in this suit, NHRA makes and enforces the rules for competing in NHRA events, including controlling who may participate in such events. NHRA is regarded as the premier professional drag-racing organization in the United States. However, NHRA has no authority over exhibits at events not affiliated with their organization.

17.     NHRA organizes and governs, among other events and series, the NHRA Mello Yello Drag Racing Series, which is the premier national series in drag racing and comprises 24 races each year. Though NHRA is the organizer of its events, it is the talent and skill of the competing drivers and the publicity of the exhibits at NHRA events that allow NHRA to profit.

18.     NHRA owns and operates Lucas Oil Raceway, which is located in the greater Indianapolis, Indiana area, and is the site of the annual NHRA U.S. Nationals. NHRA's Division 3 office also is located in Indianapolis, Indiana.

## JURISDICTION AND VENUE

## I.     SUBJECT MATTER JURISDICTION

19.     This Court has jurisdiction because this is a civil action arising under the laws of the United States. *See* 28 U.S.C. § 1331. Specifically, Plaintiffs seek to prosecute civil claims under the Sherman Act, 15 U.S.C. §1 *et seq*.

20.     This Court also may exercise jurisdiction under 28 U.S.C. §1337(a) because this is a civil action arising under an act of Congress regulating commerce or protecting trade and commerce against restraints on trades and monopolies.

21.     Further, this Court may exercise jurisdiction under 28 U.S.C. § 1332 (a)  because

the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000, and concerns citizens of different states.

22.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. The Court has original jurisdiction over Plaintiffs' Sherman Act claims, and Plaintiffs' state law claims are so related to Plaintiffs' federal law claims that they form part of the same case or controversy.

## II.     PERSONAL JURISDICTION

23.     This Court may exercise personal jurisdiction over Defendant NHRA under 15 U.S.C. § 22 based on Defendant's national contacts.  Defendant NHRA hosts events all over the United States and has designated registered agents within the United States.

24.     In addition to hosting NHRA events around the country, the NHRA owns and operates one of the premier drag racing venues in the world, the Lucas Oil Raceway in Brownsburg, Indiana. At the Lucas Oil Raceway, the NHRA hosted approximately 68 events in 2016, 65 events in 2017, 51 events in 2018, and is scheduled to host 66 events in 2019. Plaintiffs' claims, in part, relate to and arise from NHRA's activities in Indiana and in this district.

25.     Due to the number of NHRA events throughout the country, NHRA has divided the United States, and part of Canada, into seven NHRA divisions.  NHRA's Division 3 consists of six US States, including Indiana, and one area of Canada.  NHRA Division 3 has scheduled 15 official NHRA race events in the 2019 calendar year in Indiana, all of which will occur in this judicial district. It is therefore no surprise that NHRA's Division 3 headquarters are located in Indianapolis, Indiana.  Further, though there are several NHRA events throughout the country,

the location NHRA designates each year for its NHRA U.S. Nationals is the Lucas Oil Raceway in Indianapolis, Indiana.

26.     Given Defendant's systematic and continuous contacts with Indiana and the substantial connection between Plaintiffs' claims and those contacts, this Court may exercise specific and general jurisdiction over Defendant NHRA. This Court has jurisdiction over the parties hereto under Federal Rule of Civil Procedure 4(k)(1)(A) and the Indiana long-arm statute (Indiana Trial Rule 4.4(A)).

## III.      VENUE

27.     Venue is proper in the Southern District of Indiana under Section 12 of the Clayton Act, codified at 15 U.S.C. § 22, and 28 U.S.C. § 1391 (c)(2) for Defendant NHRA regularly transacts business in this district.

28.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391 (b)(2) for a substantial part of Defendant's misconduct and the damages caused by that misconduct occurred in this district. Plaintiffs' claims arise from harm and conduct occurring in meetings with Defendant within this district and at Defendant's racing events, several of which are organized, promoted, and occurred in this district.

## FACTS

## I.      MR. DIXON'S BACKGROUND OF SUCCESS IN NHRA

29.     Mr. Dixon has been a driver and/or team owner in NHRA for almost 25 years. During that time, he has been one of NHRA's most successful competitors, winning three NHRA Top Fuel National Championships, and winning 62 events overall.

30.     Mr. Dixon's competitive success, safety focus, and love for NHRA have garnered him significant recognition.  Indeed, two past NHRA presidents have described Mr. Dixon as an

"ambassador" for NHRA, and he is widely recognized as one of the stars of the sport of professional drag racing.

31.     Mr. Dixon has epitomized good sportsmanship and NHRA's stated purpose of a safe, family-oriented racing environment.  Mr. Dixon has *never* been sanctioned for a lack of sportsmanship or for any other alleged acts of misconduct in his 25 years of racing.  In addition, Mr. Dixon, as a husband and father of three, promotes family values and makes time for fans, media, sponsors, and others involved in the sport.  He has also been a leading advocate of racing safety initiatives.

32.     Mr. Dixon has devoted essentially his entire adult life to NHRA, and his participation in NHRA as a driver and team owner has been his sole source of income.  In 2012, Mr. Dixon formed Larry Dixon Racing, LLC ("Larry Dixon Racing"), which he operates in Indiana as the company's sole and managing member.

## II.   MR. DIXON'S IDEA FOR THE TWO-SEATER DRAGSTER

33.     In 2015, and more earnestly in 2016, Mr. Dixon began developing an idea for what he saw as an opportunity to promote the sport of drag racing with a new racing experience involving a top-fuel two-seater vehicle.

34.     Mr. Dixon saw the top-fuel two-seater experience as an unfulfilled opportunity for the serious drag-racing fan, and he began efforts to explore the construction of a top-fuel two-seater dragster (the "Two-Seater Dragster," as also defined in paragraph 2 above).  Mr. Dixon believed that, with his knowledge, experience, and success in top-fuel drag racing, coupled with his focus and emphasis on safety, he was ideally positioned to pursue this opportunity.

### III.   INITIAL DISCUSSIONS WITH NHRA

35.     Although not required to do so by the NHRA Rulebook or otherwise, because he believed that the Two-Seater Dragster could be beneficial for NHRA and of interest to the organization, Mr. Dixon directly reached out to NHRA in 2016 with his idea. In the spring of 2016, Mr. Dixon began discussions with NHRA at their Indianapolis office. That summer, he met with the NHRA President, Peter Clifford, and Vice President of Competition for the NHRA, Graham Light, at the NHRA offices in Indianapolis to discuss the Two-Seater Dragster. Discussions with NHRA continued into 2017.  NHRA representatives expressed enthusiasm for this idea, as did others within the NHRA community (including sponsors, race tracks, and others).

36.     In Mr. Dixon's extensive discussions with NHRA, he answered a number of questions regarding the Two-Seater Dragster, including questions about the engine, his business plan, and other related issues.  However, *at no time* in the course of those discussions did NHRA tell Mr. Dixon that he could be banned from NHRA if he pursued this initiative or that he would be prohibited from running the Two-Seater Dragster at any of the NHRA member tracks. Indeed, NHRA encouraged Mr. Dixon to develop the Two-Seater Dragster.

37.     Mr. Dixon, in good faith, obtained an investor, formed Championship Adventures, and commenced to invest hundreds of thousands of dollars, and countless hours of effort over more than two years, into developing a prototype Two-Seater Dragster.

### IV.   CONSTRUCTION OF THE TWO-SEATER DRAGSTER

38.     As an NHRA competitor, Mr. Dixon has always been safety-focused.  He has always considered the safety requirements in the NHRA Rulebook to be minimum requirements,

10

and he has consistently sought to exceed, and has exceeded, those requirements.

39.     Mr. Dixon brought this same safety focus to his construction of the Two-Seater Dragster.  Indeed, Mr. Dixon's goal in constructing the Two-Seater Dragster was to meet and exceed the NHRA requirements for a top-fuel dragster competition car, even though this was not required by the NHRA Rulebook or otherwise, and even though the vehicle was never intended for competition.  Therefore, Mr. Dixon ensured that it was built by highly recognized, safety-minded professionals associated with SFI Foundation ("SFI").

40.     SFI is the organization responsible for issuing and administering standards for the quality assurance of racing equipment.  SFI issues standards, or specifications, that are used by equipment manufacturers whose products are used in professional auto racing.   SFI specifications are incorporated as part of the rules of race sanctioning organizations, including NHRA.  (*See* http://sfifoundation.com/.)

41.     In constructing the Two-Seater Dragster, Mr. Dixon engaged a highly qualified and experienced professional in the design and construction of drag-racing vehicles, Murf McKinney of McKinney Corp.  Mr. McKinney is a member of the SFI Chassis Committee and a member of the SFI Board of Directors.   Thus, Mr. McKinney is intimately familiar with the standards applicable to the design and construction of top-fuel drag-racing vehicles.

42.     Mr. McKinney brought that expertise and experience to bear in the development of the Two-Seater Dragster.  Indeed, Mr. McKinney has stated:  "We did our due diligence on the engineering and FEA of the conversion to assure the completed chassis would be ***equal to or better than the existing SFI spec*** for a traditional Top Fuel car, which is the benchmark in the industry."

43.     Mr. Dixon also consulted with other highly qualified and experienced professionals associated with other two-seater experiences to get the benefit of their knowledge and experience in building and operating safe, reliable two-seater cars.

44.     The safety of the prototype for the Two-Seater Dragster that emerged from this process is illustrated by the fact that K&K, a professional racing-industry leader in insurance underwriting with a AAA rating, wrote an insurance policy covering the operation of this car.

## V.   THE SEMA SHOW AND THE PENALTY NOTICE

45.     After almost two years of development, Championship Adventures was able to complete its prototype and proudly display it at the SEMA Show in Las Vegas in the fall of 2017. Championship Adventures' Two-Seater Dragster was anticipated to be, and was, a huge hit at the SEMA Show.

46.     SEMA (Specialty Equipment Market Association) is the premier automotive specialty products trade show in the country. It is not owned, operated, or sanctioned by NHRA, or otherwise affiliated with NHRA, other than NHRA being one of many vendors participating in the trade show. In short, the SEMA Show is not in any way, and could not reasonably be construed as, an "NHRA event," either under common meaning or as defined in the NHRA Rulebook. Thus, while NHRA is free to prescribe rules for its own events, it lacked any such authority with respect to the SEMA Show.

47.     Mid-morning on the first day of the SEMA Show, October 31, 2017, an NHRA representative strategically visited Championship Adventures' booth at a time when Mr. Dixon was not there, intending to conduct an unauthorized "inspection" of the prototype of the Two-Seater Dragster. The NHRA representative leaned down into the cockpit to read a small, old racing sticker (the "Sticker") that was placed on the lower inside of the cockpit. The Sticker was

expired, as stated on the face of the Sticker.  On information and belief, the Sticker stated that it expired in 2015.

48.    The Sticker was approximately one inch by two inches in size, and visible and readable only by leaning down into the cockpit of the car in order to observe the Sticker at close range.  The Sticker was there simply because the chassis for the prototype of the Two-Seater Dragster was originally a car that had competed in NHRA.  No one had removed the Sticker, as there was no need to remove an expired sticker when the car was not built as a competition car.

49.    The purpose of a **non-expired** sticker is to facilitate inspection and confirm compliance **at the start of a competitive NHRA event**. The SEMA Show, however, was not an NHRA event, nor was the prototype being prepared for any competitive NHRA event, or for any other competition of any kind.

50.    The NHRA Rulebook does **not** require the removal of an expired sticker, nor does it state that leaving an expired sticker even on a competitive car is illegal.

51.    Notwithstanding that the Sticker served no purpose, was highly inconspicuous inside the cockpit, and that NHRA had no authority or jurisdiction over this exhibition car on display at the SEMA Show, the NHRA representative demanded that the Sticker be covered up.

52.    While they had no obligation to do so, Plaintiffs' representatives complied without objection to the NHRA representative's demand, and they covered up the Sticker with black tape.

53.    Mr. Dixon came back by the booth around noon and was informed by his representatives about what transpired with the NHRA representative.  When Mr. Dixon looked at the tape and saw that it was curled on the ends, he proceeded to remove the curled tape in order to replace it with new tape, only to discover that the Sticker was now gone.

54.     On information and belief, the NHRA representative removed and confiscated the sticker without permission and without authority, even though the Sticker was covered up, the SEMA Show was not an NHRA event, and Mr. Dixon owned the Sticker.

55.     NHRA's unlawful theft and conversion of the Sticker was completely unnecessary.  The Sticker did not convey—nor was it intended to convey—any message of NHRA affiliation or approval, and the inconspicuous location of the Sticker, its small size, and its stated expiration precluded any possibility of conveying such a message.  In fact, the Sticker's presence on the lower inside of the cockpit was nothing more than an oversight, and no reasonable observer would have concluded that it conveyed any message of affiliation or approval by NHRA (if a reasonable observer would have even noticed the presence of the Sticker at all).  In any event, Plaintiffs' representatives immediately covered it up when asked to do so, which took place on the *first morning of the show*, long before the car was ever run.  And had Plaintiffs' representatives been asked to remove the Sticker, they also would have complied with such a request.

56.     On the last day of the SEMA Show, November 3, 2017, Mr. Dixon received a "Statement of Action Against Participant" signed by Josh Peterson, Vice President, Racing Administration.   Totally contradicting NHRA's previous encouragement regarding the Two-Seater Dragster , the Penalty Notice claimed that:

> "As you were told by NHRA officials on multiple occasions, NHRA has not and will not approve a two-seat top fuel dragster for a variety of reasons, including but not limited to the fact that the SFI Foundation will not issue a chassis specification for such use.  The two-seat top fuel dragster concept presents serious safety concerns that have not been satisfied and that we do not believe can be satisfied."

57.     The Penalty Notice alleged that Mr. Dixon's actions at the SEMA Show violated sections 1.3.1 (Participant Conduct) and 1.6.3 (Chassis Inspection) of the NHRA Rulebook, and

that "because of the severe and serious nature of this situation," Mr. Dixon was *indefinitely suspended from NHRA*, *whether as a driver, team owner, or otherwise*.

58.     The Penalty Notice stated in relevant part that Mr. Dixon's "privilege to participate in NHRA racing has been revoked indefinitely, including without limitation any access to any restricted area and being granted a restricted area credential."  It further stated, "During this time, you are prohibited from competing in any NHRA event or working on a crew at any NHRA event, including without limitation driving and/or being a full or partial owner of any vehicle that competes."

59.     The Penalty Notice did not identify the NHRA officials who allegedly previously made statements to Mr. Dixon regarding NHRA's refusal to approve a two-seater, nor did the Penalty Notice identify the multiple occasions or details (date, place, manner, etc.) where these statements allegedly were made.

60.     In fact, the Penalty Notice's allegations of advance notice by NHRA to Mr. Dixon were simply false.  Prior to the issuance of the Penalty Notice, no NHRA official had *ever* told Mr. Dixon that NHRA has not approved and will not approve a two-seater top-fuel dragster, nor had any NHRA official *ever* warned Mr. Dixon that he could be subject to *any* penalties (let alone indefinite suspension) for pursuing the Two-Seater Dragster initiative.

61.     The Penalty Notice also did not identify the "variety of reasons" for NHRA's refusal to approve Championship Adventures' Two-Seater Dragster, other than the lack of SFI specifications and unspecified "serious safety concerns."  Nor did the Penalty Notice identify any of the alleged "serious safety concerns," depriving Mr. Dixon of any opportunity to respond to or address such alleged concerns.

62. The Penalty Notice further alleged that Mr. Dixon—despite the inconspicuous location of the Sticker and its small size, and despite that the Sticker served no purpose outside the context of an NHRA event—"included an NHRA chassis tag on an unauthorized and unapproved two seat dragster" and thereby "implied NHRA's approval" of the Two-Seater Dragster.

63. This allegation of "implied approval" was both wrong and nonsensical, for all of the reasons set forth in paragraph 47 above. Indeed, due to the inconspicuous location of the Sticker, its small size, and its stated expiration—as well as that it was first covered up and then removed on the first morning of the SEMA Show, long before the car was ever run—there is simply no rational basis for concluding that the Sticker conveyed any message whatsoever, and certainly not one of "implied approval" (for no more than the mere couple of hours that the Sticker was actually still present inside the cockpit of the car on the first morning of the SEMA Show).

64. On information and belief, prior to the SEMA show, NHRA in its more than 66-year history has never announced that an expired sticker must be removed, nor had it ever issued a penalty for the display of an expired sticker. NHRA's intent was not to protect the integrity of NHRA-sanctioned races; NHRA intended to destroy Plaintiffs' ability to compete in the markets at issue in this case.

65. The Penalty Notice also failed to explain why Mr. Dixon allegedly needed NHRA's approval for the display of the Two-Seater Dragster prototype at the SEMA Show.

## VI. MR. DIXON'S INITIAL APPEAL OF NHRA'S PENALTIES

66. Mr. Dixon sent a letter to NHRA on or about November 14, 2017, accompanied by a check for $1,000.00 (One Thousand Dollars), seeking to appeal NHRA's penalties.

67.     On or about December 5, 2017, without affording Mr. Dixon any hearing or the opportunity to present the grounds for his appeal, NHRA issued a letter to Mr. Dixon upholding his suspension and stating that NHRA had "decided to stand by its initial decision."  NHRA further informed Mr. Dixon that if he would like "to proceed with the appeal process at the Review Panel level," he would need to submit "a formal request within 10 business days."

68.     On or about December 15, 2017, Mr. Dixon submitted the "formal request" to proceed with his appeal.

69.     In the course of Mr. Dixon's appeal, he asked Mr. Peterson if he could have legal counsel represent him, and Mr. Peterson responded "that wasn't necessary" in an effort to make sure that NHRA could take advantage of Mr. Dixon's inferior bargaining position without the benefit of legal counsel. Accordingly, Mr. Dixon proceeded without the assistance of counsel in the initial stages of his appeal.

70.     On or about February 5, 2018, Mr. Dixon submitted a letter and documents (the "Appeal Materials") in support of his appeal to the Review Panel responsible for his case.  The Review Panel assembled to decide whether Mr. Dixon could continue to engage in his profession consisted solely of three NHRA employees—Kasey Coler, Mike Rice, and Curt Winiecki.

71.     In submitting the Appeal Materials, Mr. Dixon sought to correct and supplement data compiled from NHRA regarding his appeal, and he noted that NHRA's information appeared to have been "prepared by a trained legal person/lawyer."  However, in response to an email inquiry from Mr. Dixon, NHRA informed him that the appeal was an "informal" event. Afraid to offend NHRA and afraid of provoking further retaliation by NHRA that could destroy him financially, Mr. Dixon did not retain legal representation at that time.  Instead, he prepared and submitted the Appeal Materials without legal assistance.

72.     On or about February 6, 2018, the day originally scheduled for a hearing on Mr. Dixon's appeal, NHRA issued a document entitled "NHRA's Response to Notice of and Grounds for Appeal of Larry Dixon," again wrongly and arbitrarily concluding—without providing Mr. Dixon the benefit of a hearing, counsel, or presentation of his case—that NHRA's penalties against Mr. Dixon were appropriate.

73.     Because of Mr. Dixon's dogged pursuit of justice, NHRA eventually held a hearing (the "Appeal Hearing") on Mr. Dixon's appeal on March 22, 2018.

74.     When Mr. Dixon asked to attend the Appeal Hearing, he was told he could not. Although Mr. Dixon's livelihood and financial future were on NHRA's chopping block, NHRA prohibited him from presenting his case.

75.     When Mr. Dixon asked to otherwise participate in the Appeal Hearing, he was told he could not participate, other than to answers questions on the telephone from the panelists, but only if the panelists wanted to ask him questions.

76.     Indeed, Mr. Dixon was not allowed to see any evidence presented against him, nor hear testimony against him, let alone cross-examine any witnesses. Mr. Dixon does not know who testified against him, what they said, and what evidence may have been presented, as there is neither a record of the Appeal Hearing (at least not one Mr. Dixon has been provided) nor a record of what was provided to the panelists in advance of the hearing.

77.     To no surprise, given NHRA's predisposition on this matter, NHRA issued another document entitled "NHRA's Response to and Notice of and Grounds for Appeal of Larry Dixon," again concluding that NHRA's penalties against Mr. Dixon were appropriate. NHRA's decision was baseless, capricious, and designed only to injure Plaintiffs and the relevant markets alleged herein.

78.     On or about April 19, 2018, NHRA issued its Decision on Mr. Dixon's appeal.

79.     The Decision restated much of what was said in the Penalty Notice, claiming that the lack of SFI specifications and unspecified safety concerns regarding the Two-Seater Dragster justified the indefinite suspension of Mr. Dixon.

80.     The Decision's reliance on the lack of SFI specifications lacked any rational basis and was inconsistent with NHRA's own actions.  Indeed, Mr. Dixon engaged a highly qualified SFI expert in order to design and build the vehicle to meet and exceed SFI standards.  Moreover, NHRA has expressly approved and endorsed *three* other two-seater dragsters, despite the same lack of SFI specifications for those cars.  On information and belief, NHRA approved these two-seater dragsters only because NHRA would obtain revenue generated by those exhibition cars.

81.     The Decision also alleged that Mr. Dixon violated the same two provisions of the NHRA Rulebook.  This allegation was false.

82.     The Decision alleged that Mr. Dixon had violated Section 1.3.1 (Participant Conduct), because his "actions in connection with the two-seater dragster are detrimental to the sport of drag racing and create a condition or circumstance that is unsafe and out of order."  This conclusion was clearly incorrect, as (i) the NHRA Rulebook, by its own terms, did *not* govern the SEMA Show, (ii) the mere display of the car at the SEMA Show clearly did not create any unsafe conditions, (iii) Section 1.3.1 applies only to "events" as defined by the NHRA Rulebook (which the SEMA Show was *not*), and (iv) Mr. Dixon never engaged in any unsafe or unsportsmanlike conduct, or any other conduct whatsoever that could reasonably be deemed "detrimental to the sport of drag racing."

83.     The Decision further stated that Mr. Dixon had violated Section 1.6.3 (Chassis Inspection), citing the portion of the rule prohibiting the operation of a vehicle "anywhere at all

outside a repair garage" unless it complies with "current NHRA Chassis Certification requirements." This conclusion was also clearly incorrect, as Section 1.6.3 applies "for the limited purpose" of NHRA certifying a vehicle for "operat[ion] at NHRA or NHRA Member track events"—*i.e.,* drag-racing events conducted by NHRA, or drag-racing events conducted at NHRA member tracks that are conducted in accordance with NHRA Rules. (*See* Sections 1.6.3 and 1.1 (defining "event"), NHRA Rulebook.) But the SEMA Show was *not* a drag-racing event at all, let alone an NHRA or NHRA Member track event, and the Two-Seater Dragster was *not* intended for competition. Therefore, Mr. Dixon's display of the Two-Seater Dragster prototype at the SEMA Show was unambiguously outside the scope of Section 1.6.3.

84. Thus, both of the alleged NHRA Rulebook violations—as set forth in both the Penalty Notice and the Decision—were wholly incorrect and, in fact, contrary to the very terms of the NHRA Rulebook. Mr. Dixon had committed no violations of the NHRA Rulebook, whether at the SEMA Show or at any other time. Accordingly, NHRA's purported bases for suspending Mr. Dixon were unjustified, arbitrary, and capricious. There was simply no rational basis for concluding that Mr. Dixon had violated either of these rules. Instead, NHRA's goal was to freeze Plaintiffs out of the markets at issue in this case and to cause catastrophic financial harm to Mr. Dixon.

85. In an obvious effort to use NHRA's unfettered control over professional drag racing to control the market in which two-seater exhibition cars compete for business, the Decision further stated that Mr. Dixon could not compete in NHRA as a driver or team owner unless he would "ensure" that the Two-Seater Dragster would not be operated *anywhere in the world*, with it being "the committee's strong recommendation" that he "dismantle" the car. This recommendation would, of course, require Plaintiffs to forfeit the hundreds of thousands of

dollars already invested in the car, as well as all prospective revenue from more than two years of development efforts.

86.     The Decision further threatened that if Mr. Dixon chose "to promote the two-seater dragster *in any manner*," then "such action will be deemed not in the best interests of NHRA and the sport of drag racing and violative of the Rulebook," and his "privilege to participate in NHRA racing is subject to being revoked indefinitely." (emphasis added)

## VII.    MR. DIXON'S FINAL APPEAL OF NHRA'S PENALTIES

87.     NHRA's Rulebook provided for a final appeal.  Following the Decision, Mr. Dixon retained counsel and pursued a final appeal of NHRA's penalties.  On or about May 1, 2018, counsel for Mr. Dixon sent a letter (the "Appeal Letter") to NHRA, invoking the final-appeal procedures of the NHRA Rulebook.

88.     Under the NHRA Rulebook, Mr. Dixon's final appeal was to be heard by another three-person panel, two of whom were *not* to be NHRA employees, a requirement presumably designed to at least appear to provide a fair and quasi-independent final hearing.  (*See* Section 1.8.7, Final Appeal, NHRA Rulebook.)  Indeed, the NHRA Rulebook requires that the two non-NHRA-employee panelists "shall not have been involved as a competitor of the participant in NHRA events in the given calendar year," "shall not have a personal financial interest in the outcome of the Final Appeal," and "shall not have an actual conflict of interest with the appealing participant." (*Id.*)

89.     The NHRA Rulebook further provided that Mr. Dixon had the right to attend his final appeal hearing with the assistance of counsel, which presumably would afford him some due process rights.  (*See* Section 1.8.7, Final Appeal, NHRA Rulebook.)

21

90.     However, in violation of the express terms of the NHRA Rulebook, Mr. Dixon's final appeal hearing never took place.

91.     Instead, violating its own Rulebook, NHRA issued a letter on July 2, 2018 (the "Final Decision"), bypassing Mr. Dixon's right to a final appeal hearing and declaring Mr. Dixon guilty of all charges, but with his suspension purportedly lifted for "time served."  In addition to repeating the false allegations of rules violations against Mr. Dixon, the Final Decision stated that NHRA would continue to ban Championship Adventures' Two-Seater Dragster exhibition car from *all* NHRA Member Tracks.

92.     NHRA has never publicly announced or otherwise published its purported decision to "lift" Mr. Dixon's suspension, the effect of which is to not lift the suspension at all. In any event, any such action would have been too late for the 2018 NHRA racing season, and any "lifting" of the suspension without a public exoneration of Mr. Dixon is wholly insufficient. NHRA's false branding of Mr. Dixon as guilty of these allegations has the effect of continuing Mr. Dixon's suspension in perpetuity.

93.     Mr. Dixon's purported reinstatement was also effectively conditioned upon his agreement to NHRA's continued unlawful prohibition of the Two-Seater Dragster running "at any NHRA member track, at any type of event, including private track rentals, private events, open test sessions and private test session."  In other words, Mr. Dixon's purported reinstatement would continue *only if* he agreed to NHRA's unlawful prohibition of his business venture, which would require him to forfeit both hundreds of thousands of dollars already invested and all future revenues/profits from his business venture. NHRA set this condition in order to prevent Plaintiffs' Two-Seater Dragster from competing in the markets relevant to this lawsuit.

94.     The Final Decision also attempted to identify, after the fact, the purported safety concerns that justified NHRA's Penalty Notice eight months earlier.  However, none of these purported concerns had any factual basis or any actual merit.

95.     For example, the Final Decision mentioned as one such concern the "explosive nature" of the fuel to be used in the Two-Seater Dragster—the *same fuel* that is used in top-fuel cars approved *for competition* by NHRA for NHRA revenue-generating events, even though those cars operate at much higher speeds, for longer distances, and under far more dangerous, side-by-side race conditions.

96.     Likewise, the Final Decision mentioned another such concern as "Insurance and insurability"—which was not even a safety concern.  In any event, however, any such concern had already been addressed, as Mr. Dixon had obtained insurance for the Two-Seater Dragster.

97.     In fact, all of the purported safety concerns identified in the Final Decision were post-hoc and fabricated rationalizations for a wholly unjustifiable decision and lacked any grounding in actual safety issues with Plaintiffs' prototype, which NHRA had never bothered to examine.

## VIII.     NHRA'S INTERFERENCE WITH MR. DIXON'S BUSINESS RELATIONS

98.     During the same time period, NHRA contacted race tracks, and on information and belief, sponsors and other third parties, and instructed them to *not* do business with Mr. Dixon or Championship Adventures in any way with respect to the Two-Seater Dragster.

99.     In fact, one of the panelists for Mr. Dixon's appeal, Mike Rice, sent an email (the "Rice Email") to race tracks on November 17, 2017, that stated:  "As most of you are already aware, the two seat TF car is not allowed to run at ANY NHRA Member Track."  In other words, NHRA not only instructed race tracks not to run Championship Adventures' car during NHRA

events, but further instructed the tracks not to run Championship Adventures' car at *any* time (365 days per year) in *any* event, even when NHRA was not running any NHRA events at the track, and even if NHRA did not run any events at the NHRA member track. NHRA member track owners had no choice but to comply with NHRA's request given NHRA's monopolistic power over professional drag racing and its concomitant power over member tracks' financial wellbeing.

100.    On information and belief, such communications from NHRA were not limited to the Rice Email.  On its face, the Rice Email suggests that NHRA had already issued other such communications.  Plaintiffs further expect that, through discovery, additional emails, documents and other evidence of NHRA's interactions with Mr. Dixon's business partners and prospective business partners, and efforts by NHRA to prevent those parties from doing business with Championship Adventures and Mr. Dixon, will be found.

101.    Prior to the NHRA's interference, Plaintiffs were progressing with the planned launch of Championship Adventures' Two-Seater Dragster business venture in 2018.  Indeed, Mr. Dixon had engaged in discussions and negotiations with race tracks, prospective sponsors, and others regarding the commercialization of the Two-Seater Dragster. Thus, Plaintiffs had already secured informal business relationships with some tracks and sponsors, and firm commercial relationships and contracts were imminent.

102.    These communications from NHRA were successful because they falsely characterized Plaintiffs' Two-Seater Dragster as dangerous and noncompliant, they at least implicitly threatened catastrophic economic harm to track owners, they falsely characterized Plaintiffs' conduct, and they relied on NHRA's monopolistic power and not on the value or safety of Plaintiffs' Two-Seater Dragster. Those threatened by NHRA have discontinued

negotiations with Plaintiffs, and others will not talk to Plaintiffs, unlawfully depriving them of the opportunity to commercialize the Two-Seater Dragster.

103.     Meanwhile, NHRA had expressly approved and/or endorsed at least ***three other two-seater dragsters***, despite the same lack of SFI specifications for those cars that supposedly led to NHRA's opposition of Championship Adventures' Two-Seater Dragster.  These actions further interfered with Mr. Dixon's business venture by placing him at a competitive disadvantage relative to these vehicles. On information and belief, NHRA directly profits or is entitled to directly profit from the three approved two-seater dragsters.

## IX.     THE ONGOING HARM AND DAMAGES TO MR. DIXON, LARRY DIXON RACING, AND CHAMPIONSHIP ADVENTURES

104.     Mr. Dixon and Larry Dixon Racing have suffered and accumulated, and continue to suffer and accumulate on a daily basis, significant damages as a result of Mr. Dixon's indefinite, wrongful suspension from NHRA, as well as NHRA's wrongful portrayal of Mr. Dixon as a violator of NHRA rules.

105.     Mr. Dixon has made his livelihood for over two decades as a driver and team owner in NHRA.  He has now been ***entirely deprived*** of his livelihood and sole source of income by this unjustifiable suspension—which is, in effect, a lifetime ban from NHRA—unless he relinquishes an investment of hundreds of thousands of dollars, as well as the future profits that he could derive from that investment.

106.     In addition, NHRA's unjustified and unlawful interference with Mr. Dixon's and Championship Adventures' business relationships, as well NHRA's unlawful anticompetitive actions to exclude Championship Adventures' Two-Seater Dragster from the marketplace, have already resulted in significant lost revenues and/or profits, which only continue to grow.

107.    Finally, Mr. Dixon's personal and professional reputation has been damaged, and continues to be damaged, by NHRA's actions.  NHRA's wrongful public portrayal of Mr. Dixon as a violator of NHRA rules, coupled with NHRA's stubborn refusal to admit that its findings were wrong, gravely jeopardizes Mr. Dixon's ability to obtain sponsors or otherwise compete in NHRA events, even if he were unconditionally reinstated.  NHRA's unjustified penalties have stained Mr. Dixon's otherwise unblemished record, and unless NHRA publicly retracts its previous findings, the harm to Mr. Dixon will continue unabated.

## CAUSES OF ACTION

### I.    DENIAL OF DUE PROCESS AND BAD-FAITH SUSPENSION

108.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

109.    As set forth above, NHRA has monopoly power in relevant professional drag-racing markets and as a result of that monopoly power, possesses the ability to exclude professional drag racers from participation in NHRA events.  As such, NHRA's disciplinary decisions have the power to determine the ability of individual drivers and team owners, such as Mr. Dixon, to engage in their professions.  Indeed, NHRA's suspension of Mr. Dixon and public branding of Mr. Dixon as a rule violator have effectively prevented him from engaging in his profession for more than a year.

110.    Under these circumstances, a private organization is required to observe basic standards of due process, comply with its own rules, and act in good faith when making disciplinary decisions—especially those decisions that may cost an individual the ability to practice his own profession.

26

111.   NHRA's punishment of Mr. Dixon fails all of these requirements.   NHRA's disciplinary and appeals process did not comport with basic standards of due process, and NHRA violated the procedural guarantees of the appeals process mandated by its own Rulebook. NHRA arbitrarily and unjustifiably concluded that Mr. Dixon had committed rules violations, even though those rules unambiguously did not preclude Mr. Dixon's activities.   Finally, NHRA acted in bad faith in departing from its own Rulebook and historical practices in indefinitely suspending Mr. Dixon from any participation in NHRA, whether as a driver or team owner, for alleged violations that he never committed.

112.   NHRA deprived Mr. Dixon of minimum due process guarantees by, among other things, (i) indefinitely suspending him from any participation in NHRA without meaningful notice of specific actions which are governed and/or prohibited by the Rulebook, (ii) denying Mr. Dixon the right to participate in his own initial appeal hearing, thereby preventing him from confronting the evidence and the witnesses against him, and also preventing him from presenting any evidence in his own favor, and (iii) departing from its own NHRA Rulebook, including without limitation through arbitrary and nonsensical applications of the rules, throughout the disciplinary and appeals process.

113.   In addition, NHRA's punishment was unjustifiable, arbitrary, and capricious for all of the reasons explained below.

114.   *First*, the NHRA Rulebook, by its own terms, does not apply to the SEMA Show. SEMA is not owned, operated, or sanctioned by NHRA, or otherwise affiliated with NHRA other than through NHRA's participation in the event as one of hundreds of trade-show vendors, and the SEMA Show is not an "event" governed by the NHRA Rulebook.   (*See* Section 1.1, NHRA Rulebook (defining an "event").)

27

115.   *Second*, as explained in paragraphs 74 to 76 above, the claimed violations of the NHRA Rulebook were clearly incorrect, as Mr. Dixon engaged in no conduct that violated either Section 1.3.1 (Participant Conduct) or Section 1.6.3 (Chassis Inspection), nor did those rules even apply to the SEMA Show.  There is no reasonable basis, either under the rules or in fact, for concluding that Mr. Dixon violated either of these sections of the NHRA Rulebook.

116.   *Third*, the alleged statements of advance notice by NHRA to Mr. Dixon prior to the SEMA Show are both unsubstantiated and untrue.  NHRA has not identified the officials who allegedly made those statements, nor has it identified the date, location, and/or manner in which those alleged statements were made.  Moreover, this is a red herring, as Mr. Dixon did *not* need NHRA's approval in order to display a car at a third-party trade show, and the Rulebook does *not* prohibit such a display even if NHRA will not approve the car for participation in NHRA events.

117.   *Fourth*, NHRA's reliance on the lack of an SFI specification for a two-seater dragster had nothing to do with the simple display of the car at the SEMA Show.  Moreover, NHRA ignored that Mr. Dixon had built the Two-Seater Dragster to meet and exceed SFI standards, and NHRA's insistence on an SFI specification for Championship Adventures' Two-Seater Dragster is wholly inconsistent with NHRA's own actions in expressly approving and endorsing at least three other two-seater dragsters (despite the lack of SFI specifications for those same cars).

118.   *Fifth*, NHRA's reliance on unspecified safety concerns also had nothing to do with the simple display of the car at the SEMA Show.  Moreover, NHRA wholly failed to specify any of those purported safety concerns to Mr. Dixon at any time prior to the issuance of the Penalty Notice, during Mr. Dixon's appeal, or in the Decision.  Instead, NHRA waited until

28

the conclusion of Mr. Dixon's appeal—after denying him the right to a final appeal hearing with the assistance of counsel—to identify those purported concerns, none of which had any merit, in the Final Decision.

119.    In fact, NHRA has never undertaken any due diligence regarding the design, workmanship, and safety of the Two-Seater Dragster.  Had NHRA ever bothered to perform such due diligence, it would have found that the Two-Seater Dragster met and *exceeded* SFI specifications for a top-fuel competition car, even though the car was never going to be run competitively, and even though Mr. Dixon was not required to meet such requirements.  But NHRA did not perform any due diligence, nor did it even attempt to reconcile its allegations with its approval of other non-SFI-certified two-seater cars, which approvals may have generated revenue for NHRA.

120.    While irrelevant to the mere display of the car at the SEMA Show, the lack of any merit to these alleged safety concerns is glaringly evident from the following:  (i) the Two-Seater Dragster does not race alongside other race cars, as do NHRA's top-fuel competition cars, (ii) the Two-Seater Dragster runs 75 mph *slower* than NHRA's competition cars; (iii) the Two-Seater Dragster runs on what is commonly referred to as a "detuned" basis (safer with less stress) than do the NHRA competition cars, and (iv) the Two Seater Dragster runs a shorter distance than the NHRA competition cars.

121.    In short, NHRA cannot rationally explain why its competition cars are "safe" and this exhibition car is not.  What is clear is that NHRA applies one safety standard for a less-safe car in which it generates revenue, and a different, impossible-to-meet standard for a safer car in which it does not generate revenue.

122.   **Sixth,** NHRA issued the Final Decision without complying with the appeal procedures mandated by its own Rulebook, which required Mr. Dixon's final appeal to be heard by a three-member appeal panel, two of whom were ***not*** to be NHRA employees and were required to be free of any conflicts of interest.   (*See* Section 1.8.7, Final Appeal, NHRA Rulebook.)  Mr. Dixon also had the right to attend his final appeal hearing with the assistance of counsel.  However, contrary to NHRA's Rulebook, that hearing never took place, depriving Mr. Dixon of his opportunity to contest NHRA's charges with the assistance of counsel before a quasi-independent review panel.

123.   **Seventh**, the penalty imposed by NHRA bears no rational relationship to the alleged infraction and is inconsistent with NHRA's historical assessment of penalties.   On information and belief, NHRA has ***never*** imposed a financial penalty of this magnitude on any participant in its 66-year history, let alone for the mere display of a car at a private trade show.

124.   Here, Mr. Dixon committed no violations of the NHRA Rulebook.  However, even if he had, the penalties imposed by NHRA were grossly disproportionate in light of Mr. Dixon's 25-year, penalty-free history in NHRA, his roles as a champion and ambassador for NHRA, and his complete transparency with NHRA regarding the Two-Seater Dragster initiative—coupled with the total lack of notice from NHRA over the course of approximately two years of discussions that this initiative could subject him to any form of discipline.

125.   The draconian punishment levied on Mr. Dixon bears no rational relationship to his alleged and non-existent infraction—displaying a small, barely visible expired sticker at a third-party trade show, which is not a violation of the NHRA Rulebook nor even subject to its jurisdiction—and is not only arbitrary and capricious, but also wholly unconscionable.

126.    Moreover, the reasons cited by NHRA for Mr. Dixon's suspension were mere pretexts.  The real purpose of the draconian punishment imposed on Mr. Dixon, as well as NHRA's departures from its own disciplinary and appeals process, was to prevent competition with the NHRA-authorized two-seater dragsters (which like Championship Adventures' Two-Seater Dragster do not race or participate in any NHRA events), and/or to not allow Mr. Dixon to act independently of NHRA without NHRA profiting from such actions.  NHRA's abuse of its monopoly power is an exercise of bad faith and should not be condoned.

127.    As a result of NHRA's denial of due process and bad-faith, arbitrary and capricious disregard for its own Rulebook, Mr. Dixon has been deprived of his very livelihood. This deprivation is both unlawful and unconscionable.

## II.    DEFAMATION

128.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

129.    NHRA's public statements maliciously accusing Mr. Dixon of violating NHRA rules constituted false, defamatory communications that injured Mr. Dixon's personal and professional reputation.

130.    NHRA's malicious, false, and defamatory statements were made with actual knowledge of, and/or reckless disregard for, the falsity of such statements.  Indeed, NHRA acted contrary to its own Rulebook in publicly branding Mr. Dixon as a violator of NHRA rules and publicly making false statements that it knew or should have known were false.

131.    As a result of NHRA's malicious, false, and defamatory public statements, Mr. Dixon has been deprived of his very livelihood for more than a year, and that deprivation will continue unabated at least until NHRA corrects those defamatory statements.

### III.   TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AND/OR BUSINESS RELATIONS

132.   The allegations set forth in the preceding paragraphs are incorporated herein by reference.

133.   In the course of developing the Two-Seater Dragster, Mr. Dixon, on behalf of Championship Adventures, discussed and explored commercial opportunities with various third parties, including race tracks, sponsors, and others.  Many of these third parties were enthusiastic regarding the opportunity to partner in the commercialization of the Two-Seater Dragster, and Mr. Dixon entered into advanced discussions and negotiations with these prospective business partners.

134.   Mr. Dixon and his prospective business partners reasonably expected to achieve substantial commercial success with the Two-Seater Dragster.  Indeed, Mr. Dixon had designed the Two-Seater Dragster to provide a safe and superior two-seater experience, and Plaintiffs' market research revealed that the demand is high for the experience that the Two-Seater Dragster offers race fans.  This research also suggests that enthusiasm expressed by track owners and sponsors were well-founded as the track owners would reap significant revenue from operation of the Two-Seater Dragster at their venues and sponsors would obtain valuable exposure by virtue of the Two-Seater Dragster's operation.

135.   Accordingly, Plaintiffs had a reasonable expectation, and a reasonable probability, of obtaining an economic advantage or benefit from their relationships with prospective business partners and the commercialization of the Two-Seater Dragster.

136.   NHRA knew that Plaintiffs were involved in these discussions and had established relationships with prospective business partners.  NHRA also knew that Plaintiffs had a reasonable expectation, and a reasonable probability, that they would obtain an economic

32

advantage or benefit from their relationships with prospective business partners and the commercialization of the Two-Seat Dragster.

137.    Through misrepresentations to Plaintiffs' business associates and to the public, threats, violation of Mr. Dixon's due process rights, defamation of Mr. Dixon, and misuse of its monopolistic power over professional drag racing, NHRA intentionally, unlawfully, and without justification interfered with Plaintiffs' relationships with their prospective business partners, and thereby also interfered with Plaintiffs' reasonable expectation and probability of obtaining an economic advantage or benefit from these relationships and the commercialization of the Two-Seater Dragster.

138.    NHRA interfered by, among other things, directing NHRA member race tracks not to allow Plaintiffs to run the Two-Seater Dragster on their tracks.  NHRA's directive was backed by the implicit (if not explicit) threat that NHRA member race tracks would lose the economic benefits provided by NHRA's association with them if they did not comply.

139.    On information and belief, NHRA also interfered by, among other things, instructing prospective sponsors and other third parties to refrain from any involvement with Championship Adventures' Two-Seater Dragster.  NHRA's instruction was backed by its monopoly power in professional drag racing and the implicit (if not explicit) threat of adverse consequences to anyone in the drag-racing industry who partnered with Plaintiffs.

140.    NHRA's interference was designed to disrupt, and did disrupt, Plaintiffs' relationships with their prospective business partners.  Indeed, as a result of NHRA's interference, Plaintiffs' prospective business partners discontinued negotiations with Plaintiffs, depriving Plaintiffs of the opportunity to commercialize the Two-Seater Dragster.

141.    NHRA's interference was unjustified and fulfilled no legitimate business purpose,

as it was wholly unrelated to the preserving and promoting of competition or safety at NHRA events. Rather, NHRA's intentional interference was designed to reflect an exercise of its monopolistic powers by outlawing anything remotely related to its business in which NHRA did not profit, and to insulate NHRA-authorized two-seater dragsters from competition, as Plaintiffs' Two-Seater Dragster was designed to be a superior alternative to the NHRA-authorized two-seater dragsters.

142.   NHRA's interference was independently unlawful and illegal, because as explained *infra*, it violated Mr. Dixon's due process rights and defamed him. It also violated, among other laws, Sections 1 and 2 of the Sherman Antitrust Act and state antitrust laws.

143.   In the absence of NHRA's interference, which disrupted (and in fact halted) Plaintiffs' relationships with prospective business partners, it is reasonably probable that Plaintiffs would have realized an economic advantage or benefit. Indeed, it is highly likely that Mr. Dixon—with his track record of NHRA success, his longstanding commitment to safety, and his reputation and relationships in the industry—would have realized substantial commercial success, absent NHRA's intentional and unlawful interference. Plaintiffs had recently conducted several demonstrations and received rave reviews from those who rode in the Two-Seater Dragster, further substantiating Plaintiffs' expectation of commercial viability and success.

144.   As a result of NHRA's intentional and unlawful interference, Plaintiffs have sustained and continue to sustain substantial damages, including but not limited to (i) the loss of the hundreds of thousands of dollars invested in the Two-Seater Dragster to date, and (ii) lost revenues and profits from the commercialization of the Two-Seater Dragster.

## IV.   GROUP BOYCOTT IN VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1) AND THE CARTWRIGHT ACT (CAL. BUS. & PROF. CODE §§ 16700-16770)

145.   The allegations set forth in the preceding paragraphs are incorporated herein by

reference.

146.    NHRA organized and directed a group boycott of Championship Adventures'
Two-Seater Dragster, resulting in an unreasonable restraint of trade.

147.    The relevant markets for purposes of this claim (and the claims that follow)
include at least: (i) the nationwide market for professional drag racing, (ii) the nationwide market
for two-seater dragster riding experiences, (iii) the nationwide market for professional drag-
racing venues, (iv) the nationwide market for motorsport fan experiences, and (v) the nationwide
market for drag race fan experiences (collectively, the "Relevant Markets").  NHRA possesses
and exercises substantial market power in the Relevant Markets.

148.    NHRA organized a group boycott by, among other things, directing NHRA
member race tracks ***not*** to allow Championship Adventures' Two-Seater Dragster to run on their
tracks (the "Track Boycott"), runs which would not be during or related in any way to NHRA
events.

149.    NHRA's direction to NHRA member race tracks was backed by the implicit (if
not explicit) threat that allowing Championship Adventures' Two-Seater Dragster to run on their
tracks would cause them to lose their relationships with NHRA, the substantial revenues
associated with NHRA events, and other economic benefits.

150.    The Track Boycott thus involved an understanding or agreement among NHRA
and NHRA member race tracks that resulted in concerted action to achieve a common unlawful
objective—the exclusion of Championship Adventures' Two-Seater Dragster from running on
any of the more than 140 NHRA member race tracks, which not only insulated the NHRA-
authorized two-seater dragsters from competition, but was also designed to deny Plaintiffs access

to the tracks with the greatest following among drag-racing fans in order to destroy their business.

151.    Access to NHRA member race tracks is essential for Championship Adventures' Two-Seater Dragster to become a viable competitor in the relevant markets.  The NHRA member race tracks dominate key geographic areas and key venues throughout the United States, including the most-renowned drag-racing tracks in the sport.

152.    The Track Boycott deprived, and continues to deprive, Plaintiffs of access to this necessary resource, which has resulted in their exclusion from the Relevant Markets. But perhaps more importantly, the Track Boycott decreases consumers' and fans' access to drag racing and drag racing experiences and artificially increases the price of such experiences.

153.    There was no necessary or legitimate business justification for the Track Boycott of Championship Adventures' Two-Seater Dragster.  Indeed, the purpose of the Track Boycott is wholly unrelated to the preserving and promoting of competition or safety at NHRA events.

154.    NHRA's anticompetitive purpose in organizing and directing the Track Boycott was to exclude Championship Adventures' Two-Seater Dragster from competing with the NHRA-authorized two-seater dragsters and to destroy Mr. Dixon's business so that it would not compete against NHRA's other economic interests.

155.    There is no procompetitive benefit to NHRA's actions, as the Track Boycott does not result in reduced prices or higher quality in any of the Relevant Markets, nor does it reduce barriers to entry in any of the Relevant Markets.

156.    NHRA's unlawful attempts to destroy competition have injured competition in each of the Relevant Markets; suppressed sales of Plaintiffs' products and services; diminished Plaintiffs' future sales opportunities; and increased Plaintiffs' operating costs.  Indeed, the Track

Boycott has effectively put Plaintiffs' Two-Seater Dragster initiative to the brink of being out of business.

157.    NHRA's overall course of conduct has and will continue to, *inter alia*, maintain supra-competitive prices in the Relevant Markets, harm innovation associated with the products and services offered in each of the Relevant Markets, and otherwise rob customers of their ability to make an unfettered choice on the merits of the relevant products or services.

**V.    VIOLATION OF THE SHERMAN ACT – UNLAWFUL MONOPOLIZATION (15 U.S.C. § 2)**

158.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

159.    NHRA possesses monopoly power in the Relevant Markets.

160.    For the purpose of maintaining its monopoly power in the Relevant Markets, NHRA has committed at least the following acts (the "Exclusionary Acts"):

    a)  Discouraging, dissuading, and/or prohibiting NHRA member race tracks from providing access to non-NHRA-authorized two-seater dragsters, including Championship Adventures' Two-Seater Dragster;

    b)  Discouraging, dissuading, and/or prohibiting NHRA member race tracks, NHRA sponsors, and others from doing business or otherwise being affiliated with any non-NHRA-authorized two-seater dragsters, including Championship Adventures' Two-Seater Dragster; and

    c)  Penalizing Mr. Dixon, including suspending him indefinitely from ***any*** participation in NHRA events or activities, for developing and attempting to market the Two-Seater Dragster, which was designed to compete with and be

superior to the NHRA-authorized two-seater dragsters, and which threatened to redirect sponsor dollars to Mr. Dixon's business enterprise.

161.    NHRA's Exclusionary Acts excluded competitors, including Plaintiffs, from each of the Relevant Markets and have deprived consumers of the benefits of competition in those markets.

162.    NHRA does not have a legitimate business purpose for the Exclusionary Acts, which are wholly unrelated to the preserving and promoting of competition or safety at NHRA events.

163.    There is no procompetitive benefit to the Exclusionary Acts, as NHRA's exclusionary conduct does not result in reduced prices or higher quality, nor does it reduce barriers to entry in the Relevant Markets.  Moreover, as set forth above, the Exclusionary Acts do not serve to preserve or promote competition or safety at NHRA events.

164.    NHRA's unlawful monopolization has injured competition in each of the Relevant Markets; suppressed sales of Plaintiffs' products and services and those of other competitors; diminished Plaintiffs' future sales opportunities and opportunities of other competitors; and increased Plaintiffs' operating costs and the operating costs of other competitors.

165.    NHRA's overall course of conduct has and will continue to, *inter alia*, maintain supra-competitive prices in the Relevant Markets, harm innovation associated with the products and services offered in each of the Relevant Markets, and otherwise rob customers of their ability to make an unfettered choice on the merits of the relevant products or services.

**VI.    VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2)**

166.    The allegations set forth in the preceding paragraphs are incorporated herein by

reference.

167.     NHRA undertook the Exclusionary Acts with a specific intent to monopolize and destroy competition in each of the Relevant Markets (as defined in paragraph 138 *supra*).

168.     NHRA willfully engaged in a course of exclusionary conduct, including performing all of the Exclusionary Acts (as defined in paragraph 151 *supra*).

169.     NHRA does not have a legitimate business purpose for the Exclusionary Acts, which are wholly unrelated to the preserving and promoting of competition or safety at NHRA events.

170.     There is no procompetitive benefit to the Exclusionary Acts, as NHRA's exclusionary conduct does not result in reduced prices or higher quality, nor does it reduce barriers to entry in the Relevant Markets.  Moreover, as set forth above, the Exclusionary Acts do not serve to preserve or promote competition or safety at NHRA events.

171.     Throughout the course of the time NHRA engaged in this course of exclusionary conduct, it had a dangerous probability of succeeding in gaining a monopoly (or increasing its existing monopoly) and controlling each of the Relevant Markets and excluding competitors.

172.     NHRA's unlawful attempts to destroy competition have injured competition in each of the Relevant Markets; suppressed sales of Plaintiffs' products and services; diminished Plaintiffs' future sales opportunities; and increased Plaintiffs' operating costs.

173.     NHRA's overall course of conduct has and will continue to, *inter alia*, maintain supra-competitive prices in the Relevant Markets, harm innovation associated with the products and services offered in each of the Relevant Markets, and otherwise rob customers of their ability to make an unfettered choice on the merits of the relevant products or services.

## VII. CONSPIRACY TO MONOPOLIZE IN VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2) AND THE CARTWRIGHT ACT (CAL. BUS. & PROF. CODE §§ 16700-16770)

174.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

175.    As set forth above, NHRA combined and/or conspired with others, including NHRA member race tracks, in directing and carrying out the Track Boycott, thereby denying Championship Adventures' Two-Seater Dragster access to a resource necessary for it to compete in the Relevant Markets.

176.    NHRA has performed overt acts in furtherance of the combination or conspiracy, including but not limited to instructing NHRA-member race tracks not to allow Championship Adventures' Two-Seater Dragster to run on their tracks.

177.    NHRA's actions were taken with the specific intent to monopolize the Relevant Markets, preventing Championship Adventures' Two-Seater Dragster from competing with the NHRA-authorized two-seater dragsters.

178.    There is no procompetitive benefit to NHRA's actions, as the NHRA's exclusionary conduct does not result in reduced prices or higher quality in any of the Relevant Markets, nor does it reduce barriers to entry in any of the Relevant Markets.

179.    NHRA's exclusionary conduct has injured competition in each of the Relevant Markets; suppressed sales of Plaintiffs' products and services; diminished Plaintiffs' future sales opportunities; and increased Plaintiffs' operating costs.    Indeed, the Track Boycott has effectively put Plaintiffs' Two-Seater Dragster initiative on the brink of being out of business.

180.    NHRA's overall course of conduct has and will continue to, *inter alia*, maintain supra-competitive prices in the Relevant Markets, harm innovation associated with the products

and services offered in each of the Relevant Markets, and otherwise rob customers of their ability to make an unfettered choice on the merits of the relevant products or services.

## VIII.  ILLEGAL TYING ARRANGEMENT IN VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)

181.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

182.    NHRA has monopoly power over the nationwide market for professional drag racing ("Professional Drag Racing Market"). Defendant has employed its monopoly in the Professional Drag Racing Market to gain monopoly power and leverage control in the (i) the nationwide market for two-seater dragster riding experiences,  (iv) the nationwide market for motorsport fan experiences, and (iii) the nationwide market for drag race fan experiences ("Riding/Experience Markets").

183.    NHRA possesses monopoly power over the Professional Drag Racing Market because it is the only national drag racing circuit in which professional drag racers, such as Mr. Dixon, can earn a living. In addition to potentially winning millions of dollars in prize money, drag racers gain exposure through broadcasts of NHRA events by third parties, which allow racers to acquire professional endorsements and sponsorship, as well as fans. In 2016 FOX Sports committed to televising NHRA events on a long-term basis. FOX Sports networks aired more than 500 hours of programming throughout the year, highlighted by seventeen live race-day shows, including four on FOX's national network, in addition to primetime Friday night qualifying shows. As the largest auto racing organization in the world, NHRA is the only drag racing entity in which fans are familiar universally.

184.    NHRA also has a monopoly on the Riding/Experience Markets, which it desires to protect. Fan riding experiences attract even more patrons to events and have become a

lucrative part of NHRA events and other racing experiences. Fan experiences have cross-over appeal in that they attract non-fans and casual fans of drag racing who might now otherwise attend an NHRA event or watch it on television. By controlling who is allowed to enter the Riding/Experience Markets, NHRA ensures that NHRA and/or their affiliates profit from this valuable piece of racing entertainment.

185.    When NHRA refused to allow Mr. Dixon to race in the NHRA if he were to maintain his Two-Seater Dragster, the NHRA created an illegal tying arrangement. Knowing that Mr. Dixon's Two-Seater Dragster venture would compete with the NHRA and/or its affiliates in the Riding/Experience Markets, the NHRA only allowed access to compete in professional drag racing to Mr. Dixon on the condition that Mr. Dixon abandon his Two-Seater Dragster venture. NHRA fabricated the reasons for Mr. Dixon's suspension and coerced Mr. Dixon to cease entrance into the Riding/Experience Markets in order to keep his place as an NHRA drag racer. In doing so, NHRA solidified its monopoly in the Riding/Experience Markets by leveraging its monopoly power in the Professional Drag Racing Market.

186.    As a result of NHRA's tying arrangement, the Riding/Experience Markets and Plaintiffs and consumers are injured as described elsewhere in this Complaint.

### REQUEST FOR RELIEF

187.    To remedy these illegal acts, Plaintiffs request that the Court:

a)    Adjudge and decree that Defendant acted unlawfully in branding Mr. Dixon as a rule violator and suspending him from NHRA;

b)    Enjoin Defendant from suspending Mr. Dixon or otherwise penalizing him in any way for the events that gave rise to this lawsuit, requiring the immediate

unconditional lifting of Mr. Dixon's suspension and correcting the false public record NHRA has created about Mr. Dixon, his actions, and his reputation;

c)     Enjoin Defendant from further unlawful interference with Plaintiffs' business venture in the Two-Seater Dragster;

d)     Award to Plaintiffs the damages incurred due to Defendant's unlawful acts, as well as treble damages and/or punitive damages;

e)     Award to Plaintiffs all money and benefits received by Defendant by virtue of Defendant's unlawful acts;

f)     Award to Plaintiffs' their attorneys' fees, costs of this action, and such other and further relief as may be appropriate and as the Court may deem just and proper

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

HOVDE DASSOW & DEETS, LLC

By:     *s/Robert T. Dassow*
Robert T. Dassow, #15145-64
10201 N. Illinois Street, Suite 500
Indianapolis, IN 46290
Telephone: (317) 818-3100
Facsimile: (317) 818-3111

Of Counsel:

THE LANIER LAW FIRM
W. Mark Lanier
State Bar No.:  11934600
wml@lanierlawfirm.com
Monica Cooper
State Bar No.:  24071344
Monica.Cooper@lanierlawfirm.com
10940 W. Sam Houston Pwky North
Suite 100
Houston, Texas 77069
Telephone:  713.659.5200
Facsimile:  713.659.2204