LARRY DIXON, )
LARRY DIXON RACING, LLC, )
CHAMPIONSHIP ADVENTURES, LLC, )
)
   Plaintiffs, )
)
    v. )  No. 1:19-cv-01470-JRS-DML
)
NATIONAL HOT ROD ASSOCIATION, )
)
   Defendant. )

## Order on Motion to Dismiss

Invoking this Court's federal question jurisdiction, diversity jurisdiction and supplemental jurisdiction, Plaintiffs Larry Dixon ("Dixon"), Larry Dixon Racing, LLC, and Championship Adventures, LLC, (collectively "Plaintiffs" and the latter two collectively "the entity Plaintiffs") bring various common law and antitrust claims against Defendant National Hot Rod Association ("NHRA"). (Am. Compl., ECF No. 20.) Dixon is a drag race driver who has competed in NHRA events for almost twenty-five years. In 2017, NHRA suspended Dixon for displaying a two-seater top-fuel drag car at a tradeshow that appeared to be, but in fact was not, endorsed by NHRA. Plaintiffs allege the following claims: that NHRA's internal discipline procedures denied Dixon due process; that NHRA defamed Dixon by falsely claiming he had violated NHRA rules; that NHRA interfered with Dixon's two-seater dragster business; that NHRA breached its own rules by refusing to allow Dixon a final appeal; that NHRA trespassed into Dixon's two-seater dragster prototype and unlawfully removed

an NHRA sticker from the inside of the car; that NHRA made numerous misrepresentations to Dixon, knowing they were untrue; and that NHRA coerced Dixon to stop promoting his two-seater dragster in exchange for reinstatement in the NHRA. Plaintiffs also bring several antitrust claims, including a group boycott, unlawful monopolization, attempted monopolization, conspiracy to monopolize, reciprocal dealing, refusal to deal, and illegal tying or tie-in arrangements, in violation of the Sherman Act, 15 U.S.C. § 1 *et seq*. and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770.

NHRA now moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the following reasons, NHRA's Motion to Dismiss (ECF No. 25) is **denied in part** and **granted in part** and NHRA's Motion Requesting Oral Argument (ECF No. 27) is **denied**.

## I.    Background[1]

NHRA is a governing body for the sport of drag-racing. (Am. Compl. ¶ 17, ECF No. 20.) NHRA hosts drag-racing competitions and makes and enforces the rules that govern those events. (*Id.* ¶¶ 17 & 18; Rulebook vi, ECF No. 20.) The rules cover the safety of racing vehicles and equipment; bind all NHRA teams, members, cars, and drivers; and are contained in the NHRA Official Rulebook ("Rulebook"). (Rulebook §§ 1.2 & 1.3, ECF No. 20, ECF 26-1.) The Rulebook is the "principal source of authority for the conduct of events," "governs all decisions at NHRA events and governs all NHRA matters affected by the Rulebook, and provides "guidance in the conduct of

---

[1] Consistent with the Rule 12(b)(6) standard, Dixon's non-conclusory allegations are taken as true for purposes of NHRA's motion to dismiss.

NHRA events and events conducted at NHRA member tracks, and as to all aspects of participation in NHRA, whether or not related to an event." (*Id.* at § 1.2.)

The Rulebook contains a Covenant Not to Sue. (*Id.* at § 1.3.2.) In exchange for their participation in NHRA, all participants agree to the following:

> All decisions made by NHRA, including but not limited to those made during or incident to an event, are final and may not be appealed except as expressly subject to review herein, and such decisions may not be made the basis of a lawsuit. The participant further agrees to release and waive from liability and not to bring any action against NHRA . . . for any loss, damage, or injury, including without limitation economic loss or damages, caused by any decision, erroneous or otherwise, including without limitation decisions based on malfunctioning electronic or mechanical equipment, and all whether due to negligence or otherwise.

(*Id.* at § 1.3.2 (7).) Participants also agree not to initiate any legal action against NHRA for its publication or release of information regarding a Statement of Action Against Participant. (*Id.* § 1.8.2.2.) The Rulebook also mandates that all disputes "be resolved exclusively pursuant to the dispute resolution procedures provided in this Rulebook." (*Id.* at § 1.3.2(8).)

Dixon has participated as a driver and/or team owner in NHRA for almost twenty-five years. (Am. Compl. ¶ 30, ECF No. 20.) Dixon is a "participant" in the NHRA, which the Rulebook defines as: "any person or entity that has any ownership interest in a race team, vehicle, or otherwise" and "any person or entity directly or indirectly associated with any vehicle that has been permitted to enter an event site for the purpose of participation in an event, including, but not limited to, owners, drivers, and crewpersons." (Rulebook § 1.1, ECF No. 20.) Participation in NHRA requires "a

promise and agreement by all participants to abide by all NHRA rules, regulations, and agreements." (*Id*. at § 1.3.)

In 2012, Dixon formed Larry Dixon Racing, LLC—a driver-for-hire service in Indiana. (Am. Compl. ¶ 33, ECF No. 20.)

In 2015 and 2016, Dixon began developing a plan to create a two-seater top-fuel vehicle. (*Id*. ¶ 34.) A professional drag racer would drive the car while a fan or member of the public would sit in the passenger seat. (*Id*.) Beginning in Spring 2016 and continuing into 2017, Dixon discussed his idea for the two-seater dragster with NHRA, including NHRA president Peter Clifford and vice president of competition, Graham Light. (*Id*. ¶ 36.) NHRA representatives expressed enthusiasm for his idea. (*Id*.)

Dixon then obtained an investor and formed Championship Adventures, LLC to develop a prototype two-seater dragster. (*Id*. ¶ 38.) In constructing the two-seater dragster, Dixon consulted with Murf McKinney, a member of the SFI Chassis Committee, the organization responsible for issuing and administering standards for the quality assurance of racing equipment. (*Id*. ¶¶ 41 & 42.) The SFI Chassis Committee is independent from the NHRA. (*Id*.) Dixon engaged in discussions and negotiations with racetracks, prospective sponsors, and others regarding the commercialization of the two-seater dragster. (*Id*. ¶ 107.) While Dixon was developing his two-seater dragster, NHRA contacted racetracks and instructed them not to do business with Dixon regarding his two-seater dragster. (*Id*. ¶ 104.)

Dixon used a car that originally competed in NHRA events to create his two-seater prototype. (*Id.* ¶ 49.) The chassis of the prototype therefore bore an NHRA inspection sticker in the cockpit. (*Id.*) The sticker expired in 2015 or 2016. (*Id.* ¶ 48.) The prototype was insured by K&K, a professional racing-industry insurance underwriter. (*Id.* ¶ 45.)

Dixon first displayed his two-seater dragster prototype at the 2017 Specialty Equipment Market Association ("SEMA") show in Las Vegas. (*Id.* ¶ 46.) During the first day of the show, while Dixon was away from his prototype, an NHRA representative saw the NHRA inspection sticker in the cockpit of the two-seater dragster. (*Id.* ¶ 48.) The NHRA representative requested that the sticker be concealed, so one of Dixon's representatives covered it with tape. (*Id.* ¶¶ 51 & 52.) When Dixon returned to his exhibit, his representatives informed him of NHRA's actions. (*Id.* ¶ 54.) Dixon then looked underneath the tape and saw that the sticker was gone. (*Id.*)

On the last day of the SEMA show, November 3, 2017, NHRA sent Dixon a "Statement of Action Against Participant" which stated, in relevant part:

> As you were told by NHRA officials on multiple occasions, NHRA has not and will not approve a two-seat top fuel dragster for a variety of reasons, including but not limited to the fact that the SFI Foundation will not issue a chassis specification for such use. The two-seat top fuel dragster concept presents serious safety concerns that have not been satisfied and that we do not believe can be satisfied. Nonetheless, you had built and included an NHRA chassis tag on an unauthorized and unapproved two seat dragster that you both drove on a track and publicly displayed. Despite the fact that the tag was expired, it implied NHRA's approval, which as you know was never granted.

(*Id.* ¶ 57; Statement of Action, ECF No. 26-2 at 2.)  The Statement of Action informed Dixon that he violated Sections 1.3.1 (Participant Conduct) and 1.6.3 (Chassis Inspection) of the Rulebook by displaying the NHRA chassis tag on a chassis that had been radically altered since the inspection, and by falsely identifying his two-seat top fuel dragster as being certified.  (Statement of Action, ECF No. 26-2 at 2-3.)  § 1.3.1 states: "Any participant who, in the sole and absolute judgment of NHRA . . . (4) engages in conduct detrimental to the sport of racing; (5) otherwise creates a condition or circumstance that is unsafe, unfair, or out of order . . . shall have violated this rule regarding participant conduct."  § 1.6.3 states: "If at any time a vehicle does not comply with current NHRA Chassis Certification requirements, it will not be operated in any manner at an NHRA track, NHRA member track, or anywhere at all outside a repair garage, until required repairs have been completed and certification or recertification is obtained."  Dixon's privilege to participate in NHRA racing was revoked indefinitely.  (Statement of Action, ECF No. 26-2 at 3.)

On November 14, 2017, Dixon submitted a response to the Statement of Action. (Am. Compl. ¶ 75, ECF No. 20.)  NHRA then issued a "Response to Statement of Action Against Participant" upholding his suspension and stating that NHRA had decided to stand by its initial decision.  (*Id.* ¶ 76.)  On November 17, 2017, Mike Rice, an NHRA employee, sent an email to racetracks that stated: "As most of you are already aware, the two seat [top fuel] car is not allowed to run at ANY NHRA Member Track." (*Id.* ¶ 105.)

On December 15, 2017, Dixon submitted a formal request to proceed with an appeal. (*Id.* ¶ 77.) A participant who wishes to appeal "must submit a written Notice of and Grounds to Appeal to NHRA" with "all documents and other evidence that the participant believes substantiates the participant's position and that the participant wishes to have considered by NHRA." (Rulebook § 1.8.5, ECF No. 20.) On February 5, 2018, Dixon submitted a letter and documents to the Review Panel that NHRA assembled. (Am. Compl. ¶ 79, ECF No. 20.) The Review Panel consisted of three NHRA employees—Kasey Coler, Mike Rice, and Curt Winiecki. (*Id.*) The Review Panel is charged with reviewing "the existing record, including all evidence and materials submitted by the participant . . . and materials submitted by the appropriate NHRA representative(s)." (Rulebook § 1.8.6, ECF No. 20.) "The procedure followed by the Reviewing Panel shall be informal . . . and shall be conducted with the goal of promptly and fairly reaching resolution of the appeal." (*Id.*) "The Reviewing Panel may, if it deems it appropriate, arrange a meeting or conference call with the aggrieved participant and/or the other concerned parties or witnesses, and also may question witnesses, call additional witnesses, call for additional information or evidence, and/or conduct informal investigation outside the hearing." (*Id.*) Dixon was told that the appeal was an informal event and did not retain counsel. (Am. Compl. ¶ 80, ECF No. 20.)

On February 6, 2018, NHRA issued a document entitled "NHRA's Response to Notice of and Grounds for Appeal of Larry Dixon." (Am. Compl. ¶ 81, ECF No. 20.) The panel concluded that the penalties against Dixon were appropriate. (*Id.*)

On March 22, 2018, NHRA held a hearing on Dixon's appeal. (*Id.* ¶ 82.) NHRA denied Dixon's request to attend the hearing and/or participate remotely. (*Id.* ¶¶ 83 & 84.) NHRA then issued another document entitled "NHRA's Response to and Notice of and Grounds for Appeal of Larry Dixon" and again concluded his punishments were appropriate. (*Id.* ¶ 86.) On April 19, 2018, the Review Panel issued its Decision on Dixon's appeal, finding that Dixon violated Sections 1.3.1 and 1.6.3 of the Rulebook. (*Id.* ¶ 87.) The Review Panel upheld Dixon's suspension because: (1) NHRA did not approve the two-seat configuration car, there is no SFI specification for the configuration, and it is not in accordance with the Rulebook; (2) Dixon's actions were "detrimental to the sport of drag racing and create[d] a condition or circumstance that is unsafe and out of order", in violation of Section 1.3.1 of the Rulebook; and (3) Dixon violated Section 1.6.3 of the Rulebook, which forbids a vehicle that does not comply with NHRA Chassis Certification requirements from being operated anywhere outside a repair garage until repairs are completed and certification is obtained. (Review Panel Decision, ECF No. 26-3, at 2.)

However, the Decision also reinstated Dixon's privilege to participate in NHRA racing under the following conditions: (1) he could ensure the two-seat car would not be operated at any NHRA owned, operated, or member track; (2) he could ensure the two-seat car would not be displayed at any "NHRA track, NHRA member track, trade or car show, or anywhere else in public where its appearance or promotion may suggest or imply, or people may infer, that the car is approved by or affiliated with the

NHRA[;]" and (3) "if the two-seater chassis is returned to its original single seat configuration, and chassis certification or recertification is obtained, then it may be operated in accordance with the NHRA." (*Id.* at 3.)

After the Review Panel's decision, Dixon retained counsel and pursued a final appeal. (Am. Compl. ¶ 94, ECF No. 20.) The Final Appeal is heard by a three-member panel, two of which are not NHRA employees. (Rulebook § 1.8.7, ECF No. 20.) The Final Appeal determination is binding on all parties and is "final and shall not be further appealable to the NHRA or to any court, it being agreed that the dispute resolution procedures provided for herein are the exclusive remedy for the redress of grievances." (*Id.*)

On July 2, 2018, prior to the Final Appeal Hearing, NHRA sent Dixon a notice that it was lifting his suspension. (Modification of Statement of Action, ECF No. 26-4 at 2-3.) The Rulebook gives NHRA the ability to "modify the action to be taken against the participant if it determines that a different action or no action is warranted." (Rulebook § 1.8.3, ECF No. 20.) NHRA decided to "amend" the penalty assessed against Dixon. (Modification of Statement of Action, ECF No. 26-4 at 2-3.) Dixon's suspension from November 3, 2017 to July 2, 2018 was deemed a sufficient penalty. (*Id.*) NHRA also reaffirmed that Dixon's two-seater dragster did not comply with NHRA rules and could not be operated at any NHRA or NHRA member tracks. (*Id.*) The notice also stated that the "appearance or promotion of the two-seater vehicle must not suggest or imply . . . that the car is approved by or affiliated with NHRA in any way." (*Id.*)

Dixon did not appeal NHRA's decision to modify its action, as he could have done under Rulebook § 1.8.4. Instead, he filed suit in this Court on April 11, 2019. (Compl., ECF No. 1.)

NHRA has since approved and/or endorsed three other two-seater dragsters. (Am. Compl. ¶ 110, ECF No. 20.)

## II.    Legal Standard

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a Rule 12(b)(6) motion to dismiss, the court takes the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019). The Court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Additionally, the plaintiff must respond meaningfully to the motion to dismiss, clearly establishing the legal basis for her claim, in order to stave off dismissal. *See Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1043 (7th Cir. 1999).

"[I]f a plaintiff pleads facts that show its suit [is] barred . . . , it may plead itself out of court under a Rule 12(b)(6) analysis." *Orgone Capital*, 912 F.3d at 1044 (quoting *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995)); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (quoting *Hamilton v. O'Leary,* 976 F.2d 341, 343 (7th Cir. 1992)) (on a motion to dismiss "district courts are free to consider 'any facts set forth in the complaint that undermine the plaintiff's claim'").

"When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity . . . to amend the complaint to correct the problem if possible." *Bogie*, 705 F.3d at 608. Nonetheless, leave to amend need not be given if the amended pleading would be futile. *Id.*; *see also Foman v. Davis,* 371 U.S. 178, 182 (1962).

### III. Discussion

#### A. Motion for Oral Argument

The Court agrees with Plaintiffs that oral argument is unnecessary and that it can decide the matter on the pleadings. NHRA's Motion for Oral Argument (ECF No. 27) is therefore **denied**.

#### B. Documents Considered by the Court

Plaintiffs attached to their Amended Complaint (ECF No. 20) the NHRA Rulebook (Exhibit A) and Dixon's appeal letter and documents from February 6, 2018 (Exhibit B). NHRA, in support of its Motion to Dismiss, attached: (1) the NHRA Rulebook (ECF No. 26-1), (2) the November 3, 2017 Statement of Action (ECF No. 26-2), (3) the April 19, 2018 NHRA Review Panel Decision entitled "Appeal Panel Decision" (ECF No. 26-3), and (4) the July 2, 2018 NHRA Modification of Statement of Action in response to Dixon's "May 1, 2018 Notice of Appeal of Appeal Panel Decision" (ECF No. 26-4). Plaintiffs object to NHRA's inclusion of all documents except the Rulebook as "self-serving," "inadmissible hearsay," and "wholly unreliable." Plaintiffs ask that if the Court considers these documents, to covert NHRA's Motion into a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d).

Rule 10(c) provides that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." From that rule, the Seventh Circuit has concluded that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) (quoting *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002)). The Statement of Action, the Review Panel Decision, and the Modification of Statement of Action were all referred to in Plaintiffs' Amended Complaint. (*See* Am. Compl. ¶¶ 57, 87, 97, ECF No. 20.) Further, these documents are central to Plaintiffs' claims in that they contain the very decisions, statements, and disciplinary actions that Plaintiffs challenge in this suit. Also, to the extent it matters at this stage, they appear not to be hearsay at all or to be covered by one or more exceptions to the rule against hearsay. Fed. R. Evid. 801, 803. The Court will therefore consider the challenged documents without converting NHRA's Motion into a motion for summary judgment. Plaintiffs' objection to the documents are **overruled** and their request to convert NHRA's Motion into a motion for summary judgment is **denied**.

Plaintiffs also object to two allegations in NHRA's opening brief. First, they object on hearsay grounds to NHRA's allegation "that the viability of NHRA would be placed at risk if it were not allowed to govern with an iron fist and suspend racers for engaging in commercial activities unrelated to participation at NHRA events." Plaintiffs cite to page three of their brief, but the Court cannot locate any such allegation. NHRA does allege, however, that "Without [a participant's] promise and agreement

[to abide by NHRA rules], NHRA would not be able to function as a sport sanctioning body, and NHRA's continued viability would be at risk." This is a direct quote from § 1.3 of the Rulebook, which is attached to Plaintiffs' Amended Complaint. Plaintiffs' objection to this allegation is **overruled**.

Next, Plaintiffs object to NHRA's allegation that the chassis sticker in Dixon's prototype was "implying that the vehicle had been endorsed or approved by the NHRA." Plaintiffs argue that this was not alleged in their Amended Complaint and is not a reasonable inference that the Court may draw from the allegations. Because the Court must take Plaintiffs' factual allegations as true and draw all reasonable inferences in Plaintiffs' favor, *see Orgone Capital III, LLC,* 912 F.3d at 1044, and because the allegation in NHRA's brief was not contained in the Amended Complaint, the Court will not consider the allegation in ruling on NHRA's Motion. Plaintiffs' objection to this allegation is **sustained**.

## C. Covenant Not to Sue

NHRA first argues that Dixon's common law claims are barred by the Rulebook's covenant not to sue. Plaintiffs cursorily complain that the "ADR provisions merely provide defenses to NHRA which cannot support 12(b)(6) dismissal," (Plaintiffs' Response, ECF No. 32 at pp. 1-2), then proceed to make arguments under Rule 12(b)(6). While this may be seen as further argument to convert the instant motion to a motion for summary judgment, it could also be an argument that Federal Rule of Civil Procedure 12(c) is the proper mechanism for Defendant's motion and also requires conversion under Rule 12(d). The Court disagrees. The defense of waiver or release is

an affirmative defense, "so the proper procedure is to raise the defense and then move for judgment on the pleadings under Rule 12(c)." *Walczak v. Chi. Bd. of Educ.*, 739 F.3d 1013, 1016 n.2 (7th Cir. 2014) (citing *Carr v. Tillery,* 591 F.3d 909, 913 (7th Cir. 2010)). However, "when an affirmative defense is disclosed in the complaint it provides a proper basis for a Rule 12(b)(6) motion." *Muhammad v. Oliver,* 547 F.3d 874, 878 (7th Cir. 2008). Additionally, this technical error "is of no consequence" when the Court has before it everything necessary to rule on the defense. *Carr*, 951 F.3d at 913. NHRA's error is inconsequential. Plaintiffs, in their Amended Complaint, attach, and discuss at length, the NHRA Rulebook, which contains the Covenant not to Sue. The Court has the Rulebook before it and can properly rule on NHRA's affirmative defense.

### 1. Choice-of-Law Analysis

In determining the enforceability of the covenant not to sue, the Court must decide whether to apply Indiana or California law. Courts apply the choice-of-law rules of the state in which they sit. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp.*, 940 N.E.2d 810, 813 (Ind. 2010); *Woosley v. C.R. England, Inc.*, 890 F. Supp. 2d 1068, 1072 (S.D. Ind. 2012). Therefore, this Court must apply Indiana choice-of-law rules to analyze whether Indiana or California law applies.

Before engaging in a choice of law analysis, there must be a conflict between the states' laws. *Am. Employers Ins. Co. v. Coachmen Indus., Inc.*, 838 N.E.2d 1172, 1176 (Ind. Ct. App. 2005) (citing *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d

926, 930–31 (Ind. Ct. App. 1999)). NHRA argues that there is no "outcome determinative conflict" between Indiana and California law on covenants not to sue, and therefore the Court does not need to engage in a choice of law analysis. Plaintiffs, however, contend that because NHRA is headquartered in California and "California represents the epicenter of this dispute" California law should apply. However, both parties cite to Indiana and California law, and do not indicate that either one dictates a different result than the other. In analyzing Indiana and California law on covenants not to sue and the related issues the Parties address, the Court has not found a conflict between the two states' laws, and therefore it need not engage in a choice-of-law analysis at this stage.

2. Enforceability of Covenant Not to Sue

Plaintiffs argue that the Rulebook's covenant not to sue cannot defeat their intentional tort claims or their due process claim, is invalid because NHRA breached its own Rulebook procedures, and is an unconscionable contract of adhesion. The Court addresses each of these arguments in turn.

First, Plaintiffs contend that applying the covenant not to sue to their intentional tort claims of defamation, tortious interference, trespass/conversion, and economic duress is a violation of public policy. In support, Plaintiffs cite *State Group Industry (USA) Ltd. v. Murphy & Associates Industry Services, Inc.*, 878 N.E.2d 475 (Ind. Ct. App. 2007), which held that a limitation of remedies clause "lack[ed] the requisite specificity to protect the defendant from liability under the Crime Victims Statute stemming from the defendant's intentional misrepresentations. *Id.* at 481. The court

noted that limiting damages for an intentional, tortious act likely violated public policy. *Id.* at 479 (citing cases noting that public policy prevents a party from limiting damages for "willful and wanton misconduct"). The court also noted that Indiana courts "have declined to release parties from liability based on exculpatory provisions phrased in general terms." *Id.* at 480.

The clause at issue here suffers from the same lack of specificity:

> The participant further agrees to release and waive from liability and not to bring any action against NHRA . . . for any loss, damage, or injury, including without limitation economic loss or damages, caused by any decision, erroneous or otherwise, including without limitation decisions based on malfunctioning electronic or mechanical equipment, and all whether due to negligence or otherwise.

(Rulebook § 1.3.2(7), ECF No. 20.) The purported waiver does not on its face specifically or explicitly refer to criminal or intentional conduct on behalf of NHRA and thus "contains no clear statement that would give [Plaintiffs] notice of the harsh burden" that complete release imposes. *See Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 480 (Ind. Ct. App. 2000), *trans. denied*; *see also Powell v. Am. Health Fitness Ctr. of Fort Wayne, Inc.*, 694 N.E.2d 757, 761–62 (Ind. Ct. App. 1998) (clause stating that party was released from liability for any damages and "from any and all claims, demands, damages, rights of action, or causes of action present or future" did not "specifically or explicitly refer to the negligence" of the party and therefore did not limit the party's liability for its own negligence).

Further, Plaintiffs allege claims of defamation, tortious interference, trespass/conversion, and economic duress, which are the types of willful and wanton conduct for which public policy dictates a party cannot limit its liability.

California law also invalidates contracts that attempt to release parties from their intentional torts. *See* Cal. Civil Code § 1668 (West) ("All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law"); *Frittelli, Inc. v. 350 N. Canon Drive, LP*, 202 Cal. App. 4th 35, 43 (2011) (citing *Farnham v. Superior Court*, 60 Cal. App. 4th 69, 74 (1997)) (§ 1668 invalidates contracts that purport to exempt an individual or entity from liability for future intentional wrongs).

Therefore, at this stage, Plaintiffs' claims of defamation, tortious interference, trespass/conversion, and economic duress are not barred by the Rulebook's covenant not to sue.

Plaintiffs next argue that the covenant does not prevent them from bringing their due process claim because NHRA did not comply with its own Rulebook procedures when suspending Dixon. Plaintiffs allege that NHRA failed to comply with its disciplinary procedures when it modified its Statement of Action against Dixon on July 2, 2018. In support, Plaintiffs cite to *Cason v. Glass Bottle Blowers Association of U. S. & Canada*, 37 Cal. 2d 134 (1951), which cautioned that courts should only "interfere with the decision of an association expelling one of its members if the rules of the association governing expulsion have not been observed or if the accused member has not been afforded those rudimentary rights which will give him a reasonable opportunity to defend against the charges made." *Id.* at 143. A more recent California case

confirms this principle: "When a voluntary association disciplines one of its members, 'the only function which the courts may perform is to determine whether the association has acted within its powers in good faith, in accordance with its laws and the law of the land.'" *Stump v. Sierra Club*, No. D066956, 2016 WL 748694, at *6 (Cal. Ct. App. Feb. 25, 2016) (quoting *Budwin v. Am. Psychological Ass'n*, 24 Cal. App. 4th 875, 879 (1994)).

The Court finds that NHRA abided by its own rules and that its procedures comport with due process. NHRA's decision to modify its Statement of Action against Dixon was a proper action under § 1.8.3 of the Rulebook, which provides that NHRA can "modify the action to be taken against the participant if it determines that a different action or no action is warranted." Further, Dixon could have appealed NHRA's decision to modify its Statement of Action. (*See* Rulebook § 1.8.4, ECF No. 20) ("[I]f an individual or other entity is directly affected by and is the subject of a decision, ruling, action, or failure to act of NHRA, including but not limited to disciplinary action, the individual or entity will be allowed to appeal the decision, ruling, action or failure to act of NHRA.")

Plaintiffs argue that NHRA did not afford Dixon due process because he did not receive adequate notice of the charges pending against him and because the appeal panel was biased. The Statement of Action Against Participant gave Dixon sufficient notice of what rules NHRA believed he violated and the conduct that formed the basis of such violations. The Statement of Action clearly explained that the display of Dixon's two-seater dragster prototype with a NHRA chassis tag at the SEMA show

was a violation of Rulebook sections 1.3.1 (forbidding conduct detrimental to the sport of racing and creating an unsafe condition or circumstance) and 1.6.3 (prohibiting the operation of vehicles not in compliance with NHRA Chassis Certification requirements). Plaintiffs' cite to *Doe v. University of South California*, 246 Cal. App. 4th 221 (2016) for support of their claim that the Statement of Action failed to give Dixon sufficient notice. However, in *Doe*, the plaintiff received an initial letter listing only the code sections he allegedly violated, the date, and the victim. *Id*. at 241. Here, NHRA laid out the factual basis for its action in three paragraphs and clearly identified his allegedly wrongful conduct.

Plaintiffs' complaint that the Review Panel was biased because it was comprised of three NHRA employees is similarly ill-founded. Plaintiffs do not indicate why the three NRHA employees were biased other than the fact they were employed by NHRA and, only on insufficient "information and belief," that the Panel's decision was predetermined. This is not enough to support its claim of bias. Even if this Panel harbored some bias, it is within the discretion of contracting parties to fashion dispute resolution processes with any degree of neutrality desired. *See Sphere Drake Ins. Ltd. V. All Am. Life Ins. Co.,* 307 F.3d 617, 620 (7th Cir. 2002). Also, the Review Panel's decision was not the last step in the appeals process. The Final Appeal Panel, before which participants may appear in person and by counsel, present witnesses and evidence, and cross examine NHRA witnesses, is comprised of three members, two of which are not NHRA employees. (Rulebook § 1.8.7, ECF No. 20.) Had Dixon chosen to appeal NHRA's Decision to Modify its Statement of Action, he could have

presented his claim in front of this Final Appeal Panel. In any event, Plaintiffs give the Court no reason to assume that the review panel was biased against Dixon and did not afford him a fair process.

Plaintiffs also cite to *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527 (7th Cir. 1978), a case which interprets a waiver of recourse clause under Illinois law. Plaintiffs do not cite to a case interpreting Indiana law on the issue, however, Indiana courts are reticent to intervene in the disciplinary procedures of voluntary associations unless they violate their own rules. *Plummer v. Am. Inst. of Certified Pub. Accountants,* 97 F.3d 220, 227 (7th Cir. 1996) ("The dominant theme of the Indiana cases is, in fact, judicial reluctance to interfere with the disciplinary actions of private voluntary associations."). Because NHRA complied with its Rulebook procedures, it may assert the covenant not to sue against Plaintiffs' claim of denial of due process.

Plaintiffs next assert that the covenant not to sue does not apply because NHRA breached its own Rulebook provisions by "prohibiting Dixon from appearing before the least biased appellate panel with legal counsel." Because NHRA committed the first material breach of the contract, Plaintiffs contend, it cannot now seek to enforce the provisions of the contract against them. NHRA did not, however, as explained above, fail to comply with its disciplinary procedures when it modified its Statement of Action against Dixon. No material breach of contract has occurred and NHRA is free to seek enforcement of its covenant to sue against Plaintiffs' non-intentional tort claims.

Lastly, Plaintiffs argue that the covenant not to sue is invalid because the Rule-book is an unconscionable contract of adhesion. Plaintiffs cite to one California Supreme Court case as their only authority, which found a contract was unconscionable because it designated an arbitrator who, by reason of its status and identity, was presumptively biased in favor of one party. *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 821 (1981). California defines a contract of adhesion as "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Id.* at 817. But contracts of adhesion are fully enforceable according to their terms "unless certain other factors are present which, under established legal rules-legislative or judicial-operate to render it otherwise." *Id.* at 819–20 (citations omitted). Thus, Plaintiffs' allegation that the Rulebook is a "take-it-or-leave-it" proposition does not render it invalid unless there are other factors present that render it unduly oppressive or unconscionable. *Id.* at 820. The "other factor" Plaintiffs allege renders the Rulebook unconscionable is the "biased" Review Panel that reviews NHRA's disciplinary actions. However, as the Court explained above, Plaintiffs have not indicated why the Review Panel was biased other than the fact that its members were employed by NHRA. Moreover, the Final Appeal Panel is comprised of two non-NHRA employees who: (1) shall not have been involved as competitors of the participant in NHRA events in the given calendar year; (b) shall not have a personal financial interest in the outcome of the Final Appeal; and (c) shall not have an actual conflict of interest with the appealing participant. (Rulebook § 1.8.7, ECF No. 20.) These

requirements are sufficient to prevent bias from infecting the appeals process, and therefore further defeat any claim that the contract is unconscionable.

The remaining question for the Court is whether the Rulebook's covenant not to sue is valid and enforceable against Plaintiffs' claims of denial of due process, breach of contract, and negligent misrepresentation.

Indiana courts enforce release agreements, which they define as: "a species of contract that surrenders a claimant's right to prosecute a cause of action." *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, 653 F. Supp. 2d 895, 912 (N.D. Ind. 2009) (quoting *Moore v. Wells Fargo Constr.,* 903 N.E.2d 525, 531 (Ind. Ct. App. 2009)). The Indiana Court of Appeals has stated that "upholding releases serves an important public policy because it facilitates the orderly settlement of disputes." *Id.* "Interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances. Absent an ambiguity, release provisions are interpreted as a matter of law, and [courts] look only to the instrument to ascertain the parties' intent." *Id.*

Further, under Indiana law "[a] voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them." *Plummer*, 97 F.3d at 227 (citing *State ex rel. Givens v. Superior Court of Marion Cty.*, 233 Ind. 235, 117 N.E.2d 553, 555 (1954)). "As a general rule courts will not interfere to control the administration of the constitution and by-

laws of such association, or to enforce rights springing therefrom." *Id.*; *see also Freeman v. Sports Car Club of Am., Inc.*, 51 F.3d 1358, 1363–64 (7th Cir. 1995) (declining to intervene in club's expulsion of member and noting "that it is not uncommon for auto racing sanctioning bodies to require that rule decisions be non-litigable").

A review of California law yields largely the same result. In California, a release agreement "extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence." *Skrbina v. Fleming Co*s., 45 Cal. App. 4th 1353, 1366(1996). "The interpretation of a release is governed by the same principles applicable to any other contractual agreement." *Marder v. Lopez*, 450 F.3d 445, 449 (9th Cir. 2006) (citing *Benedek v. PLC Santa Monica, LLC*, 104 Cal. App. 4th 1351 (2002). California courts interpret the release to give effect to the parties' mutual intent, and the parties' intent is inferred from the language of the release, as long as the language is unambiguous. *Id.* (citing Cal. Civ. Code §§ 1638, 1639).

Additionally, in California, "out of respect for a private association's autonomy and special competence, courts generally will not interfere with the internal affairs of such an organization or with the enforcement of its rules unless the determination of some civil or property right is involved." *Budwin v. Am. Psychological Ass'n*, 24 Cal. App. 4th 875, 879 (1994).

NHRA's covenant not to sue is clear and unambiguous, at least inasmuch as it releases NHRA from any claims stemming from its negligence: "The participant further agrees to release and waive from liability and not to bring any action against

NHRA . . . whether due to **negligence** or otherwise." (Rulebook § 1.3.2(7), ECF No. 20) (emphasis added). Plaintiffs argue that the Rulebook's covenant not to sue does not apply in this situation because their displaying of the two-seater dragster prototype took place at a SEMA show, not at an NHRA event. However, Plaintiffs' denial of due process and breach of contract claims are both complaints about NHRA's disciplinary procedures, an action that is explicitly covered by the Rulebook: "The participant further agrees to release and waive from liability and not to bring any action against NHRA . . . for any loss, damage, or injury . . . caused by any **decision**, erroneous or otherwise. (*Id.*) (emphasis added). As for Plaintiffs' negligent misrepresentation claim, they allege that NHRA officials told Plaintiffs that their two-seater dragster only needed to comply with chassis specifications if it operated on an NHRA-owned track, not on the NHRA member tracks. This decision, while perhaps erroneous, was directly related to "providing guidance in the conduct of NHRA events and events conduct at NHRA member tracks." (*Id.* § 1.2.)

The Rulebook's covenant not to sue is unenforceable against Plaintiffs' intentional tort claims at this stage, but is valid and enforceable against Plaintiffs' claims of denial of due process, breach of contract, and misrepresentation.

Plaintiff's Motion to Dismiss (ECF No. 25) is therefore **granted** as to Plaintiffs' due process, breach of contract, and misrepresentation claims.

### D. Remaining Common Law Claims

1. Defamation

In their Amended Complaint, Plaintiffs allege that NHRA defamed them by publishing statements in public and in correspondence with track owners that: "the Two-Seater Dragster is unsafe due to its 'failure' to meet NHRA safety requirements, including without limitation those related to chassis construction and design, personal protective equipment, and fueling" and that "'insurability' was a concern despite knowing that Plaintiffs had already procured insurance covering losses arising from operation of the Two-Seater Dragster as a fan experience vehicle." (Am. Compl. ¶ 148, ECF No. 20.) Plaintiffs allege that NHRA "intentionally and recklessly published" these statements and that they " were designed to impugn Dixon's character and to decimate the marketability of Plaintiffs' Two-Seater Dragster and they did in fact have those effects." (*Id.*)

Plaintiffs Amended Complaint titles their claim as "Defamation and Trade Libel" but does not indicate whether they are pursuing a common law claim of defamation under Indiana or California law. NHRA's brief in support of its motion to dismiss cites Indiana law—arguing Dixon's failure to identify a defamatory statement is fatal to his claim, and Plaintiffs' response does not cite any law whatsoever, but seeks to identify the allegedly false statement missing from its Amended Complaint and suggesting the claim covers the entity Plaintiffs. Defendants respond that the Rulebook gives NHRA the right to publish the newly identified allegedly defamatory statement, that the Amended Complaint cannot be amended in a response brief, that the statement refers to Dixon only, and that the statement is true. None of this matters at this point.

The Court need not reach the Defendant's arguments as Plaintiffs have not given the Court sufficient guidance on what common law claim they are pursuing—defamation or libel or both—and under what law they make this claim—Indiana or California. *See Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1043 (7th Cir. 1999) (upholding the dismissal of a complaint because plaintiff failed to "respond responsively to the motion to dismiss," noting that "our system of justice is adversarial, and our judges are busy people . . . they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning"). While Plaintiffs' complaint "need not contain the legal predicate" for their claim, "when presented with a motion to dismiss, the non-moving party must proffer some legal basis to support [their] cause of action." *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1335 (7th Cir. 1995) (citing *Teumer v. Gen. Motors Corp.,* 34 F.3d 542, 545 (7th Cir.1994)). Plaintiffs' response (ECF No. 32) cites no legal authority and provides no legal basis from which the Court could determine whether Plaintiffs have properly stated a claim for defamation.

Therefore, NHRA's motion to dismiss is **granted** as to Plaintiffs' defamation and trade libel claim.

## 2. Trespass and Conversion

Plaintiffs' allege that NHRA interfered with Plaintiffs' property rights by trespassing into the cockpit of the two-seater dragster prototype at the SEMA show and removing the expired NHRA sticker from the cockpit of the prototype. (Am. Compl. ¶¶ 219-20, ECF No. 20.) NHRA argues that Plaintiffs' trespass claim fails because

they only alleged that the NHRA representative "extended his head down inside the cockpit," and Indiana and California require a showing of either (1) dispossession, (2) impairment of quality, condition, or value, (3) deprivation of use; or (4) harm to another item in which plaintiff had a protected interest. NHRA argues that their conversion claim fails because Section 1.6.4 of the Rulebook permitted NHRA to collect the tag.

Under Indiana law, to prove trespass to chattel, Plaintiffs must show that (1) NHRA dispossessed Plaintiffs of their prototype; (2) NHRA impaired their prototype's condition, quality, or value; (3) NHRA deprived Plaintiffs of the use of their prototype for a substantial time; or (4) NHRA harmed some other thing in which Plaintiffs' had a legally protected interest. *Coleman v. Vukovich*, 825 N.E.2d 397, 407 (Ind. Ct. App. 2005) (citing *Terrell v. Rowsey,* 647 N.E.2d 662, 666 (Ind. Ct. App. 1995)). The elements for trespass to chattel under California law are identical to that of Indiana. *See Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350–51 (2003).

Plaintiffs' have not alleged that the NHRA representative dispossessed Plaintiffs of the two-seater dragster prototype. Nor do they allege that the NHRA representative impaired the condition, quality, or value of the prototype or harmed some other thing in which Plaintiffs' had a legally protected interest.

As for the third element, Plaintiffs do not allege how much time the NHRA representative spent in the cockpit of the prototype. They allege that the NHRA representative "wrenched his head into the cockpit to read a small, old racing sticker that was placed on the lower inside of the cockpit" (Am. Compl. ¶ 48, ECF No. 20.) While

Plaintiffs may have been deprived of the use of the prototype for a minute or two, the Court does not find that a few minutes is a substantial amount of time. *See Terrell*, 647 N.E.2d at 667 ("Although [plaintiff] might have been deprived of the use of his car when [defendant] opened the door, it was not for a substantial time, inasmuch as [plaintiff] testified the entire episode lasted from three to five minutes and [defendant] made no attempt to utilize his automobile.") Thus, Plaintiffs have not made out a claim for trespass of chattel.

As for conversion, in Indiana, a "prima facie case of conversion requires demonstration that the tortfeasor appropriated another's personal property for the tortfeasor's own use and benefit, in exclusion and defiance of the owner's rights, and under an inconsistent claim of title." *Morris v. Crain*, 71 N.E.3d 871, 880 (Ind. Ct. App. 2017) (quoting *Campbell v. Criterion Grp.*, 621 N.E.2d 342, 346 (Ind. Ct. App. 1993) (internal quotation marks omitted). In California, conversion is "the wrongful exercise of dominion over the property of another." The elements of a conversion claim are: "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014).

It appears Plaintiffs' have sufficiently pleaded a claim for conversion under Indiana and California law. Plaintiffs pleaded they owned the sticker and the NHRA representative wrongfully took the sticker without permission. Plaintiffs also allege they suffered damages as a result of the conversion.

NHRA contends, however, that they had authority to take the sticker under Section 1.6.4 of the Rulebook, which gives NHRA permission to:

> collect and retain vehicles, parts of vehicles, equipment, **or any other items used in conjunction with participation that are owned by or in the possession of participant or present at an event** . . . including such Items that may be relevant incident to the investigation of an incident . . . or for any other purpose. NHRA may exercise this right to take and retain Items at any time when NHRA determines in its sole and absolute discretion that such actions are necessary.

(emphasis added). Indeed, Section 1.6.4 authorizes NHRA to take items "used in conjunction with participation." But Plaintiffs argue the Two-Seater Dragster was not participating in an NHRA event when the representative took the sticker. Plaintiffs were at a SEMA show, and NHRA did not have authority at that time to take the sticker. Given the breadth of the Rulebook's permission, it seems Defendant has a solid argument, perhaps even the better or winning argument in the end. For example, it cannot be gainsaid that the sticker had been used in conjunction with participation in one or more NHRA events, and it was the sticker rather than the Two-Seater Dragster that was collected. Also, "an event" is broad and unmodified by "NHRA" or any other definition of event in the provision. Neither are the terms "for any purpose," "at any time," or "in its sole and absolute discretion" further defined or circumscribed in any way. It is also unclear whether or not the sticker even "belonged" to Dixon—as opposed to being proprietary to NHRA—or that it was "wrongfully" collected given that it represents a certification conveyed by NHRA, but that no longer applied given it was expired and/or now appeared on the "Two-Seater Dragster" that was a fundamental alteration of the originally certified vehicle, and given

the broad collection authority. Indeed, one cannot take a state inspection sticker off one vehicle and place it on another, or take a UL or Good Housekeeping certification mark off of the properly tested and certified product and place it on another and then pass it off as complying with the relevant standard or regulation. Still, at this stage, the lack of clarity in the record regarding at least these issues must be resolved in favor of Plaintiffs.

Thus, while Plaintiffs' conversion claim survives NHRA's motion to dismiss, the question of NHRA's authority under Section 1.6.4 may be better addressed at the summary judgment phase.

NHRA's motion to dismiss is **granted** with respect to Plaintiffs' trespass claim and **denied** as to Plaintiffs' conversion claim.

3. Economic Duress and Coercion

Plaintiffs allege that NHRA threatened Dixon, individually and as principal of the entity Plaintiffs, with his career as a professional drag racer if he did not bend to the NHRA's whim and refrain from promoting, marketing, and operating the two-seat dragster anywhere in the world. Plaintiffs also allege that NHRA coerced him into conveying to NHRA "sole and absolute discretion to govern his professional drag racing career and his business activities beyond NHRA drag racing" by agreeing to the Rulebook.

Plaintiffs, in their response, cite California law for the broad definition of duress: "The doing of a wrongful act which is sufficiently coercive to cause a reasonably pru-

dent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158 (Ct. App. 1984). Plaintiffs allege that NHRA's wrongful act comprised threatening Dixon with his career as a professional drag racer if he promoted, marketed, or operated the two-seater dragster "anywhere at any time in any context." (Am. Compl. ¶¶ 97 & 227, ECF No. 20.) But, NHRA's Final Decision did not, as Plaintiffs suggest, prevent Dixon from operating the two-seater dragster "anywhere in the world." The Final Decision stated: "The two-seater configuration is not allowed by the NHRA Rulebook. Therefore, the two-seater vehicle should not be operated at any NHRA owned or operated track or at any NHRA member track, at any type of event, including private track rentals, private events, open test sessions, and private test sessions." (Final Decision, ECF No. 26-4.) While this wording may be seen as somewhat ambiguous, NHRA confirmed that Dixon may "continue to participate in NHRA while operating and promoting his two-seater elsewhere." (NHRA Open. Br., ECF No. 26 at 34.) NHRA merely required Dixon to comply with the Rulebook in order to participate. This is not a wrongful act and the Court need not even reach the other elements of this claim. Plaintiffs have not sufficiently pled a claim for economic duress.

Turning to the coercion claim, Plaintiffs again fail to meaningfully respond to NHRA's motion to dismiss. It appears that there is substantial overlap between this claim and the economic duress claim, and that it would therefore fail for at least the same reason, but Plaintiffs do not cite to any legal authority whatsoever. Without providing the Court with the relevant law for the common law claim of coercion, it is

unable to determine whether Plaintiffs have stated a claim. *See Stransky,* 51 F.3d at 1335 ("the federal courts will not invent legal arguments for litigants").

NHRA's motion to dismiss is **granted** with respect to Plaintiffs' claims of economic duress and coercion.

### 4. Tortious Interference

Plaintiffs' allege that NHRA interfered with their prospective two-seater dragster business by defaming Dixon, making false statements about the safety of the two-seater dragster, violating antitrust laws, placing him under economic duress, trespassing into his two-seater dragster, committing conversion by taking his chassis sticker, violating due process, and violating its own Rulebook.

Plaintiffs and Defendant both give this claim short shrift, merely focusing on the independent wrong element of this claim. California and Indiana law require plaintiffs to allege an independent wrong or illegal act other than the fact of interference itself in pleading tortious interference claims. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003); *McCollough v. Noblesville Sch.*, 63 N.E.3d 334, 344 (Ind. Ct. App. 2016). Of the common law claims Plaintiffs allege support its claim for tortious interference, the only one that has survived NHRA's motion to dismiss is conversion. Plaintiffs also allege that their antitrust claims are an independent wrong or illegal act, but those claims, as explained below, do not survive NHRA's motion to dismiss either. Therefore, the Court must address whether NHRA's conversion of Plaintiffs' chassis sticker can support a claim for tortious interference.

The elements of tortious interference with a business relationship in Indiana are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Felsher v. Univ. of Evansville,* 755 N.E.2d 589, 598 n.21 (Ind. 2001) (citing *Levee v. Beeching,* 729 N.E.2d 215, 222 (Ind. Ct. App. 2000)). California law is almost identical. *See Korea Supply Co.*, 29 Cal. 4th at 1153 (tortious interference requires a showing of: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant").

Plaintiffs' Amended Complaint alleged the existence of a valid business relationship between themselves and racetracks, sponsors, and promoters and that NHRA knew about said relationship. Plaintiffs alleged that NHRA interfered with their business relationships by "strategically" visiting Plaintiffs' two-seater dragster at the SEMA show "in an effort to undermine and derail Plaintiffs' efforts to promote and market the car." Plaintiffs also alleged that NHRA's interference was unjustified, fulfilled no legitimate business purpose, and did in fact disrupt their relationships with prospective business partners. Lastly, Plaintiffs have alleged that they suffered

damages as a result both the conversion and tortious interference. The Court finds that at this stage, Plaintiffs have stated a claim for tortious interference, barely.

NHRA's motion to dismiss is **denied** as to Plaintiffs' tortious interference claim predicated on the independent wrong of conversion.

### E. Futility of Amendment

Courts "should freely give leave [to amend pleadings] when justice so requires," Fed. R. Civ. P. 15(a)(1)(B)(2), but leave to amend need not be given "where the amendment would be futile." *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir .2011).

Further amendment of Plaintiffs' claims of denial of due process, breach of contract, and negligent misrepresentation would be futile as those claims are barred by the Rulebook's covenant not to sue. By failing to meaningfully respond to NHRA's motion to dismiss regarding their claims of defamation/trade libel and coercion, Plaintiffs have forfeited their right to continue litigating those claims. *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1043 (7th Cir. 1999).

However, the Court **grants** Plaintiffs leave to amend their claims of economic duress and trespass to chattel.

### F. Antitrust Claims

Plaintiffs allege violations of the antitrust laws, contending (1) that Defendant directed a group boycott resulting in an unreasonable restraint of trade in the relevant markets in violation of the Sherman Act, 29 U.S.C. § 1; (2) that Defendant monopolized or attempted to monopolize the relevant markets in violation of the Sher-

man Act, 29 U.S.C. § 2; (3) that Defendant conspired to monopolize the relevant markets in violation of the Sherman Act and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700–16770; and (4) that Defendant engaged in reciprocal dealing, refusal to deal, and illegal tying. Defendant argues that Plaintiffs' antitrust claims must be dismissed because Plaintiffs do not adequately allege (1) a relevant market and (2) competitive harm.

To prevail on a claim under Section 1 of the Sherman Act, a plaintiff must prove "(1) a contract, combination, or conspiracy; (2) a resultant restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Coll. Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). "Courts have established three categories of analysis—per se, quick look, and Rule of Reason—for determining whether actions have anticompetitive effects, though the methods often blend together." *Id*. What an antitrust plaintiff is required to prove—and thus what an antitrust plaintiff is required to plead—depends on which analytical framework applies to the plaintiff's claims. "Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Id*. Under the per se rule and the quick-look doctrine, on the other hand, a plaintiff may "forgo any strict showing of market power, and thus a specific definition of the relevant market." *Id*. at 337.

Accordingly, whether Plaintiffs' relevant-market and competitive-harm allegations are adequate turns on a threshold question: which analytical framework

properly applies to Plaintiffs' claims? Plaintiffs contend that the alleged restraint of trade is illegal per se, and that their market and competitive harm allegations are therefore adequate. Defendant responds that the Rule of Reason applies and that Plaintiffs' allegations are therefore inadequate.

"A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominately anti-competitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominately anticompetitive." *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 298 (1985). "[I]n the context of organized sports and sanctioning organizations, courts should be hesitant to fasten upon tags such as 'group boycott' and 'per se' in order to preclude inquiry into the business necessity for or precise harm occasioned by particular rules or practices." *U.S. Trotting Ass'n v. Chi. Downs Ass'n, Inc.*, 665 F.2d 781, 790 (7th Cir. 1981); *see also Nat'l Coll. Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984) (holding that "it would be inappropriate to apply a per se rule in this case" because it "involves an industry in which horizontal restraints on competition are essential if the product is to be available at all"). Moreover, "if a rule of a private association is not illegal per se, neither is the enforcement of the rule, as by expelling a noncomplying member—the normal method by which a private association enforces its rules." *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 600 (7th Cir. 1984) (citation omitted).

Plaintiffs' allegations do not support a plausible inference that the NHRA's alleged conduct is illegal per se. "Absent such a showing . . . courts should apply a rule-of-reason analysis." *Nw. Wholesale Stationers*, 472 U.S. at 297. "So, in the absence of an alleged per se violation of Section 1, [Plaintiffs'] federal claims require [them] to identify a relevant product and geographic market[.]" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020).

Plaintiffs have not adequately alleged a relevant market as required under the rule-of-reason construct. "A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are not likely to shift promptly to offer defendant's customers a suitable proximate (in both product and geographic terms) alternative." *Id.* at 917 (quotation marks and citation omitted). "The antitrust statutes require a 'pragmatic' and 'factual' approach to defining the geographic market. The market must correspond to the commercial realities of the industry." *Id.* (citations and quotation marks omitted). The Amended Complaint alleges five product markets—all nationwide—in conclusory antitrust terminology, and refers to them collectively throughout the complaint as the "Relevant Markets." (*See, e.g.*, Am. Compl. ¶ 118 ("Plaintiffs' research indicated that competition from other products would only come from this market because these products are not interchangeable with other products outside of this market. This market includes the smallest grouping of products in which a monopolist—hypothetical or actual—can profitably impose a small but significant and non-

transitory price increase of its own product.  Further, the products or services provided in this market are not reasonably interchangeable with products in other markets.").)  The Amended Complaint contains no facts about the economic realities of the putative Relevant Markets—most importantly, other suppliers or the lack thereof.

The same deficiencies doom Plaintiffs' Section 2 claims.  Plaintiffs allege NHRA's size in absolute terms:  6,000 annual events at 120 member tracks across forty U.S. states and Canada.  (Am. Compl. ¶ 116.)  It is the "largest auto-racing organization in the world."  (Am. Compl. ¶ 17.)  But NHRA events and NHRA member tracks are not a market.  *See Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 595 (7th Cir. 2008) ("Marathon does of course have a 'monopoly' of Marathon franchises.  But 'Marathon' is not a market; it is a trademark; and a trademark does not confer a monopoly; all it does is prevent a competitor from attaching the same name to his product.  Not even the most zealous antitrust hawk has ever argued that Amoco gasoline, Mobile gasoline, and Shell gasoline—or, we interject, Marathon gasoline—are [four] separate products.").  "No market share statistics for [NHRA—for any of the "Relevant Markets"—] either locally or nationally are given, and there is no information in the complaint that would enable [those] shares to be calculated."  *Id.*

Because Plaintiffs have not adequately alleged a relevant market, Plaintiffs' antitrust claims are **dismissed** without prejudice to amending their complaint.[2]

_____

[2] The Court notes that Plaintiffs have also not adequately alleged a competitive harm.  In amending their complaint, Plaintiffs must set forth factual, rather than mere conclusory, allegations of competitive harm  *See Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir. 1984).

## IV.    Conclusion

For the reasons explained above, NHRA's Motion to Dismiss (ECF No. 25) **is denied in part** and **granted in part**.  NHRA's motion is **denied** as to Plaintiffs' claims of conversion and tortious interference.  Plaintiffs' claims of denial of due process, breach of contract, negligent misrepresentation, defamation, trade libel, and coercion are **dismissed** on the merits **with prejudice**.  Plaintiffs' trespass, economic duress, and antitrust claims are **dismissed without prejudice** to amending their complaint within 30 days of the date of this order.

NHRA's Motion for Oral Argument (ECF No. 27) is **denied**.  Plaintiffs' objection to ECF Nos. 26-2, 26-3, and 26-4 is **overruled** and their request to convert NHRA's Motion into a motion for summary judgment is **denied**.  Plaintiffs' objection to NHRA's allegation regarding the importance of a participant's agreement to abide by the rules the is **overruled**.  Plaintiffs' objection to NHRA's allegation regarding the implications of the chassis sticker is **sustained**.

**SO ORDERED.**


Date:  _3/30/2020_____

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution via CM/ECF to all registered parties.