UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LARRY DIXON,                              )
LARRY DIXON RACING, LLC,                  )
CHAMPIONSHIP ADVENTURES, LLC,             )
                                          )
              Plaintiffs,                 )
                                          )
       v.                                 )        No. 1:19-cv-01470-JRS-DML
                                          )
NATIONAL HOT ROD ASSOCIATION,             )
                                          )
              Defendant.                  )

**Order on Motion to Dismiss (ECF No. 49)**

Plaintiffs Larry Dixon, Larry Dixon Racing, LLC, and Championship Adventures, LLC, (collectively "Plaintiffs") bring various common law and antitrust claims against Defendant National Hot Rod Association ("NHRA"). (2d Am. Compl., ECF No. 42.) NHRA now moves to dismiss Plaintiffs' Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the following reasons, NHRA's Motion to Dismiss, (ECF No. 49), is granted in part and denied in part.

## I.    Legal Standard

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a Rule 12(b)(6) motion to dismiss, the Court takes the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d

1

1039, 1044 (7th Cir. 2019).  The Court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Additionally, the plaintiff must respond meaningfully to the motion to dismiss, clearly establishing the legal basis for its claim, in order to stave off dismissal.  *See Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1043 (7th Cir. 1999).

"[I]f a plaintiff pleads facts that show its suit [is] barred . . . , it may plead itself out of court under a Rule 12(b)(6) analysis." *Orgone Capital*, 912 F.3d at 1044 (quoting *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995)); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (quoting *Hamilton v. O'Leary,* 976 F.2d 341, 343 (7th Cir. 1992)) (on a motion to dismiss "district courts are free to consider 'any facts set forth in the complaint that undermine the plaintiff's claim'").  "When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity . . . to amend the complaint to correct the problem if possible." *Bogie*, 705 F.3d at 608.  Nonetheless, leave to amend need not be given if the amended pleading would be futile.  *Id.*; *see also Foman v. Davis,* 371 U.S. 178, 182 (1962).

## II.   Discussion

Familiarity with the fact pattern as set out in the Court's first Order on Motion to Dismiss, (*see* ECF No. 34 at 2–10), is presumed.  The Court previously allowed some claims to proceed, dismissed some claims with prejudice and dismissed others without prejudice, granting Plaintiffs leave to amend their First Amended Complaint ("FAC") accordingly.  (*Id.* at 39.)  Plaintiffs did so, having now filed their Second

Amended Complaint ("SAC"), (ECF No. 42.).  NHRA now moves to dismiss Plaintiffs'
trespass, economic duress, and antitrust claims.  (ECF No. 49.)

A. *Trespass Claims*

The SAC contains a section titled "Trespass and Trespass Claims."  (SAC, ECF
No. 42 at 73.)  To the extent that Plaintiffs plead trespass to land, they have forfeited
that claim by failing to respond to NHRA's arguments for its dismissal.  *See Bonte v.
U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (plaintiff forfeits claim where he
does not oppose its dismissal).  Such claim is dismissed with prejudice.  Accordingly,
the Court need only discuss the remaining trespass-to-chattels claim.

A review of the factual differences between the FAC and SAC is in order.  In the
FAC, Plaintiffs alleged that NHRA interfered with their property rights by trespass-
ing into the cockpit of the two-seater dragster prototype at the SEMA show and by
removing the expired NHRA sticker from the cockpit of the prototype.  (FAC ¶¶ 219–
20, ECF No. 20.)  The Court previously found that Plaintiffs had not alleged dispos-
session, impairment, or a harm to another item in which Plaintiffs had a protected
interest, (*see infra*).  (ECF No. 34 at 27.)  Furthermore, the Court found that Plaintiffs
had not alleged the amount of time the NHRA representative spent in the cockpit of
the prototype.  (*Id.*)

The Court allowed Plaintiffs time to cure the deficiencies in the FAC.  Plaintiffs
now allege in the SAC that the NHRA representative took control over their exhibit
space by intentionally misrepresenting that the NHRA had authority to control the
exhibit for the inspection of the prototype.  (SAC ¶ 7, ECF No. 42 at 5.)  Plaintiffs

further allege that the NHRA representative's inspection of the prototype lasted ten minutes and Garcia's removal of the expired sticker lasted two minutes, depriving SEMA visitors of their right to properly view Champion Adventures's exhibit and decreasing the exhibit's value by $500.  (*Id.* ¶¶ 8, 261–62.)

NHRA argues that Plaintiffs' trespass-to-chattels claim still fails because the NHRA representative's presence in or near the cockpit is not a deprivation and because twelve minutes is not a substantial time, (*see infra*).  Under Indiana law, to prove trespass to chattels, Plaintiffs must show at least one of the following: (1) that NHRA dispossessed Plaintiffs of their prototype; (2) that NHRA impaired their prototype's condition, quality, or value; (3) that NHRA deprived Plaintiffs of the use of their prototype for a substantial time; or (4) that NHRA harmed some other thing in which Plaintiffs had a legally protected interest. *See Coleman v. Vukovich*, 825 N.E.2d 397, 407 (Ind. Ct. App. 2005) (citing *Terrell v. Rowsey,* 647 N.E.2d 662, 666 (Ind. Ct. App. 1995)).  The elements for trespass to chattels under California law are identical to those under Indiana law.  *See Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350–51 (2003).  The Court previously found that it need not engage in a choice-of-law analysis at this stage because there is not a conflict between the two state's laws.  (*See* ECF No. 34 at 15.)  The only issue is whether Plaintiffs' additional allegations are enough to satisfy the third formulation of trespass to chattel—that the NHRA deprived Plaintiffs of the use of their prototype for a substantial time—which Plaintiffs contend NHRA did here.

Plaintiffs assert that the NHRA representative's inspection of the prototype deprived Plaintiffs of the prototype because "NHRA exercised absolute dominion and control over the prototype to conduct the unlawful inspection, thereby depriving Plaintiffs of the use of their [two-seater dragster] at a time when it was in continual use as advertising." (ECF No. 52 at 26 (citing SAC ¶¶ 7–8, 10, 261–62, ECF No. 42).) To support their assertion, Plaintiffs analogize to cases in which courts have decided whether a trespass has occurred to an electronic device. *E.g.*, *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000); *Mey v. Got Warranty, Inc.*, 193 F. Supp. 3d 641 (N.D. W. Va. 2016). The Court finds these cases distinguishable. For example, in *eBay*, the defendant's software program was authorized to make individual queries of plaintiff eBay's system, yet the defendant admitted to sending 100,000 queries a day. *eBay*, 100 F. Supp. 2d at 1071. The court found that the defendant trespassed on the plaintiff's chattel because the defendant deprived eBay use of its servers—eBay's personal property—by using valuable bandwidth and capacity. *Id.* Here, Plaintiffs allege that the NHRA representative deprived them and their exhibit's viewers from seeing the entire prototype during the representative's inspection, thereby depriving Plaintiffs of their exhibits' intended purpose. Plaintiffs allege that the deprivation decreased the exhibits' value by $500.

Plaintiffs now allege that the chattel they were deprived of was the exhibit. But the chattel in this case can only be the two-seater dragster prototype, not the exhibit itself. Chattels are "movable[,] transferable . . . or personal property," not real property. *Chattel*, Black's Law Dictionary (11th ed. 2019). If anything, Plaintiffs' exhibit

space is more akin to real property than to chattel.  Even if Plaintiffs owned the right to possess the exhibit space during the SEMA show, the physical space of the exhibit is not moveable or transferable property; only the prototype is.  Moreover, it is unclear how value lost in the continual use of advertising is different from the value lost in the exhibit space; the two are synonymous.  That Plaintiffs were deprived use of their exhibit space is not helpful to their claim of trespass to chattels.

To be clear, the movable, transferrable, and personal property in this case (the chattel) is Plaintiffs' prototype.  Unlike in *eBay*, where eBay was deprived of using its servers (the chattel) by the defendant's conduct, Plaintiffs have not alleged facts that show they were deprived of using the prototype; Plaintiffs only allege facts that plausibly show they were deprived of using the exhibit for its intended purpose, albeit for a limited period.  Indeed, Plaintiffs merely conclude that NHRA exercised dominion and control over the prototype; however, the Court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Simply put, Plaintiffs have not alleged facts to support that they were deprived of their ability to use a chattel.

Even if Plaintiffs could allege that a trespass occurred to a chattel—which they apparently cannot—Plaintiffs also have not alleged that a deprivation occurred to a chattel for a substantial period of time.  While Plaintiffs acknowledge that twelve minutes may not be a substantial time in all contexts, (ECF No. 52 at 27), they assert that California and Indiana law "merely require that deprivation last long enough that it is possible to estimate the loss caused thereby," (ECF No. 52 at 27) (quoting

*Intel Corp. v. Hamidi*, 71 P.3d 296, 306 (Cal. 2003) (quotations omitted)).  Because Plaintiffs allege that they lost $500 of the exhibits' value during the twelve minutes NHRA inspected the prototype, they assert that twelve minutes is a substantial time. As NHRA points out, Plaintiffs misleadingly cite cases for the proposition that the relevant state law requires only "that deprivation last long enough that 'it is possible to estimate the loss caused thereby.'"  (ECF No. 52 at 36 (citing, *inter alia*, *Hamidi*, 71 P.3d at 306).)  The quoted language in *Hamidi* in fact comes from the court's discussion of whether a deprivation occurred, not whether the intrusions there occurred for a substantial period of time.  The Court stands by its previous finding that "a few minutes is [not] a substantial amount of time." (ECF No. 34 at 28.)  *See, e,g.*, *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 124 (N.D. Cal. 2020) (holding that multiple delays of two to five minutes did not equate to trespass to chattels because that repeated amount of time did not impair or damage plaintiff's chattel).  For this reason, too, the trespass-to-chattels claim fails.

Plaintiffs have failed to cure the deficiencies in their trespass-to-chattels claim. Therefore, Plaintiffs' trespass-to-chattels claim is dismissed with prejudice.

*B. Economic Duress*

Plaintiffs allege that NHRA caused them economic duress by issuing the following ultimatum: "Either (1) Dixon must personally forfeit his decades-long career as a drag racer and face imminent personal bankruptcy or (2) Dixon must cause Championship Adventures to refrain from operating the Two-Seater Dragster on NHRA member tracks or anywhere outside of the garage . . . ." (SAC ¶ 288, ECF No. 42 at 84.)  NHRA

disagrees.  It argues that Plaintiffs did not allege that they were induced to contract with NHRA as a result of NHRA's alleged wrongful conduct.

Economic duress "come[s] into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158 (1984).  Plaintiffs must prove by a preponderance of the evidence "that (i) [NHRA] engaged in a sufficiently coercive wrongful act such that; (ii) a reasonably prudent person in [Plaintiffs] economic position would have had no reasonable alternative but to succumb to [NHRA's] coercion; (iii) [NHRA] knew of [Plaintiffs'] economic vulnerability; and (iv) [NHRA's] coercive wrongful act actually caused or induced [Plaintiffs] to [contract]." *Johnson v. IBM, Corp.*, 891 F. Supp. 522, 529 (N.D. Cal. 1995).  "The burden to establish economic duress is a high one and courts 'will apply economic duress only in limited circumstances and as a last resort.'" *Advanced Cleanup Techs., Inc. v. BP Am. Inc.*, 2016 WL 67671, at *3 (C.D. Cal. Jan. 4, 2016) (quoting *San Diego Hospice v. Cnty. of San Diego*, 31 Cal. App. 4th 1048, 1058 (1995) (quotations omitted)).

Plaintiffs suggest that this Court is not bound by its prior decision that merely enforcing the Rulebook was not a wrongful act.  The Court previously stated:

> NHRA's Final Decision did not, as Plaintiffs suggest, prevent Dixon from operating the two-seater dragster "anywhere in the world."  The Final Decision stated: "The two-seater configuration is not allowed by the NHRA Rulebook.  Therefore, the two-seater vehicle should not be operated at any NHRA owned or operated track or at any NHRA member track, at any type of event, including private track rentals, private events, open test sessions, and private test sessions." (Final Decision,

8

> ECF No. 26-4.)  While this wording is somewhat ambiguous, NHRA con-
> firmed that Dixon may "continue to participate in NHRA while operat-
> ing and promoting his two-seater elsewhere."  (NHRA Open. Br., ECF
> No. 26 at 34.)  NHRA merely required Dixon to comply with the Rule-
> book in order to participate.  This is not a wrongful act.

(ECF No. 34 at 31.)  The Court stands by its prior reasoning because Plaintiffs have failed to allege any additional facts that imply that NHRA committed a wrongful act by enforcing its Rulebook.

Furthermore, even if Plaintiffs could overcome the wrongful act hurdle, Plaintiffs' additional allegations still do not support their claim of economic duress.  *See Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 469 (9th Cir. 1987) ("Economic duress occurs when a person subject to a wrongful act, such as a threat to withhold payment of an acknowledged debt, must succumb to the demands of the wrongdoer or else suffer financial ruin.").  For example, Plaintiffs now additionally allege that they have refrained from marketing the Two-Seater Dragster out of fear that the NHRA will retaliate against Plaintiffs.  (SAC ¶ 274, ECF No. 42 at 79.)  However, fear is not enough to satisfy the elements of economic duress.  *See, e.g.*, *Tanner v. Kaiser Found. Health Plan, Inc.*, 2015 WL 7770216, at *3 (N.D. Cal. Dec. 3, 2015) ("Plaintiff alleges only that he *feared* termination[.]").

Plaintiffs have failed to cure their defective economic-duress claim.  The economic-duress claim is dismissed with prejudice.

*C. Antitrust Claims*

Plaintiffs allege antitrust violations under the Sherman Act, 15 U.S.C. §§ 1 and 2.[1]  Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a "contract, combination . . . , or conspiracy, in restraint of trade or commerce."  Liability under § 2 of the Sherman Act requires proof (1) that the defendant engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  The Court previously dismissed Plaintiffs' antitrust claims, (ECF No. 34 at 39), because Plaintiffs did not adequately allege a relevant market or adequately allege competitive harm, as required by the Rule of Reason analysis governing Plaintiffs claims.  *See Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020).  NHRA argues that Plaintiffs' antitrust claims must be dismissed again because Plaintiffs still do not adequately allege (1) a viable market and (2) any harm to competition.

1. <u>Per Se Illegality</u>

Plaintiffs again offer that alleged misconduct by NHRA rises to the level of per se restraint of trade, a classification that would obviate some otherwise required analysis under the Sherman Act.  *See U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 787–88 (7th Cir. 1981) ("In certain instances the detailed factual inquiry into actual anticompetitive effect that is characteristic of the rule of reason is supplanted by a per se rule.").  But a "per se rule should not be applied, and has never been applied by the Supreme Court, to concerted refusals that are not designed to

---

[1] Plaintiffs have abandoned their antitrust claims under California's antitrust statute, the Cartwright Act.  *See* Cal. Bus. & Prof. Code §§ 16700–16770.

10

drive out competitors but to achieve some other goal. . . . The danger of rote application of the per se rule to all conduct that can be called a 'group boycott' is that the sound teachings of experience will be extended into new and unfamiliar areas, where they have no proper application." *Id.* at 788.

The Court continues to find that Plaintiffs have not alleged the kind of obvious anticompetitive behavior that constitutes a per se restraint of trade.  Although Plaintiffs say NHRA orchestrated a per se unlawful group boycott and tying arrangement, "[t]he mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominately anticompetitive." *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 298 (1985).  The present case, even as alleged, is not meaningfully distinguishable from *U.S. Trotting Association*, so far as a per se violation is concerned.  In *U.S. Trotting Association*, the Seventh Circuit found that, although the sporting association engaged in "concerted activity . . . in the sense that [it was] a membership organization enforcing rules contained in its by-laws," there was "no showing of a purpose to exclude competitors," and hence analysis under the per se violation framework was not appropriate.  *U.S. Trotting Ass'n,* 665 F.2d at 788–789; *see also Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 600 (7th Cir. 1984) ("[I]f a rule of a private association is not illegal per se, neither is the enforcement of the rule, as by expelling a noncomplying member—the normal method by which a private association enforces its rules.").  Likewise, Plaintiffs here have nakedly alleged that NHRA's only purpose in enforcing its bylaws as to Plaintiffs' dragster prototype was removing Plaintiffs as a competitor to other multi-

11

seat dragster manufacturers.  Plaintiffs otherwise have not persuasively explained how their antitrust claims fit into the narrow class of cases in which per se violations have been found at the early pleading stage.  (*See* ECF No. 52 at 33–34 (urging the Court to analyze the antitrust claims as per se violations while offering little more than the statement of the legal rule).)  Nor have they distinguished the cases the Court cited in its previous order—particularly, the cases involving private associations, *see, e.g.*, *Nat'l Coll. Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984) (holding that "it would be inappropriate to apply a per se rule in this case" because it "involves an industry in which horizontal restraints on competition are essential if the product is to be available at all").

Accordingly, a finding of a per se violation is still inappropriate for the allegations in the SAC.  The Rule of Reason governs, and Plaintiffs must plausibly plead relevant product and geographic markets in the SAC to survive dismissal.  *See, e.g., Fishman v. Est. of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986) ("Claims of monopolization under section 2 of the Sherman Act, as well as section 1 claims analyzed under the Rule of Reason, require the trier of fact to delineate the 'relevant market.'").

2.  <u>Relevant Market</u>

A relevant market in which anticompetitive conduct may be felt is comprised of those "commodities reasonably interchangeable by consumers for the same purposes . . . ."  *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  "A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are

not likely to shift promptly to offer defendant's customers a suitable proximate (in both product and geographic terms) alternative." *Sharif Pharmacy*, 950 F.3d at 917 (quotation marks and citation omitted). "The antitrust statutes require a 'pragmatic' and 'factual' approach to defining the geographic market. The market must correspond to the commercial realities of the industry." *Id.* (citations and quotation marks omitted).

Sometimes useful in framing the relevant-market inquiry is something called the hypothetical monopolist test:

> That test asks what would happen if a single firm became the only seller in a candidate geographic region. . . . If that hypothetical monopolist could profitably raise prices above competitive levels, the region is a relevant geographic market. . . . But if customers would defeat the attempted price increase by buying from outside the region, it is not a relevant market; the test should be rerun using a larger candidate region. . . . This process is iterative, meaning it should be repeated with ever-larger candidates until it identifies a relevant geographic market.

*Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016) (citations omitted). The plaintiff bears the burden to define the relevant market and to establish the defendants' market power. *Spectrum Sports*, 506 U.S. at 455.

In the SAC, Plaintiffs now allege market share percentages: NHRA controls 100% of professional top fuel racing in the United States, (SAC ¶ 130, ECF No. 42 at 39); NHRA controls over 95% of other classes of professional drag racing, (*id.*); non-NHRA races comprise less than 5% of the total market of professional drag racing, (*id.* ¶ 128); and NHRA controls over 90% of supply in the drag racing market, (*id.* ¶ 146). Additionally, the SAC proposes four markets: (1) the Drag Racing Market, (2) the Venue Market, (3) the Multi-Seat Dragster Market, and (4) the Drag Race Experience

Market.  (*Id*. ¶¶ 124–125.)  First, the Drag Racing Market consists of all races in which "[d]rag race fans are consumers," apparently including all of NHRA's races.  (*Id*. ¶¶ 127–129.)  Second, the Venue Market is defined as all tracks capable of hosting drag races.  (*Id*. ¶ 133.)  Third, the Multi-Seat Dragster Market "refers to the national market for dragsters that provides fans an experience that closely resembles high-speed, competitive drag racing" by permitting "a consumer [to] pay[] a supplier to drive a multi-seat dragster in a high-speed drag pass with the customer traveling as a passenger."  (*Id*. ¶ 140.)  Finally, the Drag Race Experience Market is defined as "multi-seat dragster fan experiences as well as other experiences, such as pit admission, electronic simulations, and hospitality areas."  (*Id*. ¶ 151.)  All four purported relevant markets are nationwide in scale.

NHRA first says the market is not properly defined, geographically.  NHRA faults the national scale of each alleged market, and NHRA argues that Plaintiffs have failed to tailor the markets to exclude suppliers that are "too far away" and thus unable to offer consumers a substitute product should a hypothetical monopolist raise prices for experiencing multi-seater dragsters.  *See Sharif Pharmacy*, 950 F.3d at 91.  According to NHRA, it "defies economic reality and common sense to assert that a potential two-seater customer in, e.g., Florida, could turn to a supplier in, e.g., California, if prices were raised in Florida."  (ECF No. 50 at 22.)  Though it would have appreciated more clarity on this point in the newest version of the complaint, the Court does not see how common sense combined with the allegations of the SAC, taken as true, fail to support the inference that multi-seater dragster suppliers target

a national market.  Plaintiffs have alleged that drag races occur in almost every state, (SAC ¶¶ 127–128, ECF No. 42), and that consumers reside across the United States but "travel to tracks in the states identified above . . . to take part in these experiences at those locations," (*id*. ¶ 149).  Furthermore, Plaintiffs have alleged that multi-seater dragsters cost "hundreds of thousands of dollars" to build, (*id*. ¶ 5), and common sense tells us that vehicles like dragsters are heavy but not immobile.  It is not unreasonable to infer that, whatever the cost of shipping a car cross-country is, such transportation cost is far lower than several hundreds of thousands of dollars and could be recouped by sales in a different locale's racing venues.  Moreover, Plaintiffs point to the fact that NHRA's suspension of Dixon was on a nationwide scale.  (*See id*. ¶¶ 11, 14.)  It is not unreasonable to infer that NHRA itself believed that Plaintiffs' dragster could serve consumers nationwide.  In other words, the allegations are that there is no "too far away" in the United States, so far as supplying multi-seater dragsters is concerned.  *Sharif Pharmacy*, 950 F.3d at 917.  Discovery may very well prove that the assumptions underlying Plaintiffs' analysis are faulty.  But taking all allegations as true at this stage, the Court cannot say that a nationwide geographical market for experiencing multi-seat dragsters is implausible.

The next question is whether Plaintiffs have adequately pleaded a relevant product market.  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.  However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust

purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (footnote omitted).  Put another way, a plausible product market must "exclude . . . other potential suppliers . . . whose product is too different" and "who are not likely to shift promptly to offer defendant's customers a suitable proximate . . . alternative." *Sharif Pharmacy*, 950 F.3d at 917.

Plaintiffs have plausibly pleaded a product market.  Curing a defect identified in the Court's previous order, Plaintiffs have alleged in the SAC that there are three other suppliers of multi-seat dragsters, all of which are "control[led]" by the NHRA. (SAC ¶ 148, ECF No. 42.)  They have alleged that consumers interested in experiencing multi-seat dragsters are not interested in other racing experiences like INDYCAR, NASCAR, or Moto GP, (*id.* ¶ 143); nor do more ordinary drag race experiences like touring pit areas or speaking to drivers give multi-seat dragster consumers' enough of a "rush," which comes only from riding in a multi-seat dragster, (*id.* ¶ 145).  Said rush comes from stimulation of four of the human senses, (*id.* ¶ 142)— especially so when the fan is riding in the dragster alongside the driver.

NHRA says these allegations are not enough.  It argues that Plaintiffs have not sufficiently pleaded cross-elasticity of demand between two-seater dragsters and substitute racing or racing-related products.  But Plaintiffs did allege that other racing and thrill experiences were not adequate substitutes for the experience of being a passenger in a two-seater dragster.  (*See, e.g.*, *id.* ¶ 141 ("Given the unique nature of drag racing, relevant products would only come from this market because these products are not interchangeable with other products outside of this market."); *id.* ¶ 144

16

("The pricing and availability of products in the Multi-Seat Dragster Market have zero effect on products available in these other fan experience markets."); *id.* ¶ 145 ("Regardless of what happens to the pricing and availability for these other [drag race] fan experiences, it would not affect the Multi-Seat Dragster Market and vice versa.").) An antitrust complaint need not expressly include the magic words "cross-elasticity of demand" to state a claim, so long as its allegations get across the idea that the proposed market excludes goods that are not viable substitutes for the relevant product.

Furthermore, the authorities NHRA cites for dismissing this case based on improperly pleaded markets involved complaints with incontrovertibly bare or wholly absent allegations of geographic or product markets. *See, e.g.*, *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 142 (E.D.N.Y. 2010) (dismissing under Rule 12(b)(6) because complaint failed to allege at all product interchangeability or cross-elasticity of demand); *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *4 (N.D. Ill. Aug. 29, 2013) (proposed single-brand product market was implausibly narrow); *Dicar, Inc. v. Stafford Corrugated Prod., Inc.*, No. CIV.A 205CV5426DMCMF, 2010 WL 988548, at *11 (D.N.J. Mar. 12, 2010) (proposed geographic market of where plaintiffs did business insufficient because there were no allegations as to how *consumers* would react to a price increase for the product). The SAC, in contrast, at least plausibly addresses product interchangeability in the proposed national market for multi-seat dragster experiences and consumer behavior.

Drawing all reasonable inferences in Plaintiffs' favor, and remembering that it should hesitate before dismissing a Sherman Act claim for failure to allege a relevant market in the absence of glaring inadequacies, *cf. Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001), the Court finds that Plaintiffs have alleged relevant geographic and product markets.

3. <u>Harm to Competitive Process</u>

The remaining ground on which NHRA moves to dismiss the antitrust claims is Plaintiffs' purported failure to plead anticompetitive harm. "Losing business to a competitor is an inevitable consequence of the economic system that the Sherman Act was designed to protect; some enterprises will prevail and others will not, but it is the function of § 1 to compensate the unfortunate only when their demise is accompanied by a generalized injury to the market." *Car Carriers*, 745 F.2d at 1109. "In order to state a cause of action under [the Sherman Act], plaintiffs must allege and prove that defendants' conduct has caused an injury to competition, not just injury to a competitor." *Hennessy Inds. Inc. v. FMC Corp.*, 779 F.2d 402, 404 (7th Cir. 1985). A naked allegation that anticompetitive conduct reduced the number of suppliers is not enough to state a claim: "The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality." *Prods. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 664 (7th Cir. 1982).

According to Plaintiffs, the anticompetitive harm from NHRA excluding their two-seater dragster prototype from the markets is a quarter reduction in supply and a

18

quarter increase in price for multi-seater dragster experiences, (SAC ¶ 207, ECF No. 42), and a generally less safe and less appealing selection of multi-seater dragsters for consumers, (*Id*. ¶ 221).  Accepting them as true, as the Court must, these facts would seem to constitute anticompetitive harm.  The claim is not just that Plaintiffs were frozen out of the market as a competitor, but that consumers were harmed by their exclusion, and that the resulting products available are more dangerous and less "fun."  (*Id*. ¶ 205.)  Nor can the Court characterize all of Plaintiffs' new allegations, which put forth in some detail the alleged injuries to competition and even attach purported numbers to the decrease in supply and increase in price owing to the "group boycott," as merely conclusory.  Although the line between conclusory and nonconclusory allegations has never been crystal clear, the allegations in the SAC are not merely a "formulaic recitation of the elements." *Twombly*, 550 U.S. at 555.

### 4. Anticompetitive Conduct

Finally, NHRA cursorily argues that Plaintiffs have not pleaded any anticompetitive conduct in support of their Sherman Act claims.  Because NHRA's briefs do not devote much energy to the anticompetitive-conduct element, the Court will not devote much space to the topic in this order.

To reiterate, liability under § 1 of the Sherman Act requires proof of a "contract, combination . . . , or conspiracy, in restraint of trade or commerce," and liability under § 2 requires additional proof that the defendant had a specific intent to monopolize and a "dangerous probability" of achieving monopoly power. *Spectrum Sports*, 506

U.S. at 456.  Monopoly power is the "power to control prices or exclude competition."
*E.I. du Pont Nemours & Co.*, 351 U.S. at 391.

As to anticompetitive conduct for § 1 and § 2, Plaintiffs have at least alleged that
NHRA combined with racetrack owners via exclusive-dealing agreements, pressure,
and threats in order to prevent Plaintiffs' two-seater dragster from operating across
the country.  (SAC ¶¶ 117–118, 135, 154, 202, 203.)  As to specific intent for § 2,
Plaintiffs have alleged that NHRA's "specific intent [was] to monopolize and destroy
competition in the Multi-Seat Dragster Market," (*id.* ¶¶ 223, 234), and to protect
"NHRA-enriching products" from competition, (*id.* ¶ 73).  And, as to whether NHRA
exhibits a "dangerous probability" of achieving monopoly power, the Court cannot say
that all of Plaintiffs' allegations as to NHRA's substantial control of both the broader
drag racing market and the narrower multi-seat drag racing market are conclusory.
(*See, e.g.*, *id.* ¶¶ 135, 140, 202, 247–248 (alleging NHRA's total control over most race-
track facilities nationwide); *id.* ¶ 148 (alleging that the only three other suppliers of
multi-seat dragsters are effectively under control of NHRA by tying or reciprocal deal-
ing); *id.* ¶ 210 (alleging that NHRA's conduct creates "artificial barriers to entry"); *id.*
¶¶ 131, 253, 293 (alleging that Rulebook gives NHRA "sole and absolute discretion"
to control which drivers appear on NHRA-affiliated tracks, which represent the vast
majority of drag racing tracks in the market).)  The Court did note in its previous
order that "NHRA events and NHRA member tracks are not a market," (ECF No. 34
at 38), and NHRA seizes onto this language to argue that Plaintiffs still have not
pleaded that NHRA controls prices or excludes competition.  However, Plaintiffs have

20

pleaded that NHRA-controlled tracks comprise at least 90 percent of viable tracks, (SAC ¶ 197, ECF No. 42), that tracks capable of hosting the two-seater dragster are scarce essential facilities, (*id.* ¶ 199), and that NHRA "sets prices by using its unfettered control" over almost all viable tracks, (*id.*).  As a whole, the complaint is not simply stating the fact—inconsequential by itself—that NHRA controls its own tracks and events.

Again, the Court must note the difficulty of distinguishing between conclusory statements and factual allegations, especially in the antitrust context.  But the Court finds that the SAC's antitrust portions say enough to state a claim.

## Conclusion

For the reasons explained above, NHRA's motion to dismiss, (ECF No. 49), is **granted in part and denied in part**.  Plaintiffs' claims for trespass to chattels, trespass to land, and economic duress are **dismissed with prejudice**.  Plaintiffs' antitrust claims survive the motion.

**SO ORDERED.**

Date: _____3/29/2021_____

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Monica Cooper
THE LANIER LAW FIRM
monica.cooper@lanierlawfirm.com

Robert Thomas Dassow
HOVDE DASSOW & DEETS LLC
rdassow@hovdelaw.com

W. Mark Lanier
THE LANIER LAW FIRM
wml@lanierlawfirm.com

Paul K. Leary, Jr.
COZEN O'CONNOR P.C.
pleary@cozen.com

Benjamin T. Major
THE LANIER LAW FIRM
ben.major@lanierlawfirm.com

Jonathan D. Mattingly
MATTINGLY BURKE COHEN & BIEDERMAN LLP
Jon.mattingly@mbcblaw.com

Thomas M. O'Rourke
COZEN O'CONNOR P.C.
tmorourke@cozen.com

David Reichenberg
COZEN O'CONNOR P.C.
dreichenberg@cozen.com